Janice BECKER, et al., Plaintiff,

v.

**GALLAUDET UNIVERSITY,**
et al., Defendant.

No. CIV. 96–1058 TFH.

United States District Court,
District of Columbia.

July 21, 1999.

Lynne Bernabei, Debra Susan Katz, Bernabei & Katz, Washington, D.C., for Plaintiff Becker.

Steven John Routh, Hogan & Hartson L.L.P, Washington, D.C., for Defendant Gallaudet University.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

This action is brought by Janice Becker, Dianne Falvo, Janet L. Gemmill, and Joanne G. Royce (collectively "plaintiffs") against Gallaudet University and Drs. I. King Jordan, Roslyn Rosen, and Diane O'Connor (collectively "defendants") for a declaratory judgment, injunctive relief, and monetary damages. Pending before the Court is defendants' motion to dismiss. For the reasons stated below, the Court will grant defendants' motion.

## I. BACKGROUND

### A. Legal Claims

Plaintiffs are four nontenured faculty members, who prior to 1996 taught in a preparatory school for students who needed to improve their English or other basic skills to be eligible for university-level studies at defendant Gallaudet University. Plaintiffs challenge Gallaudet's decision not to offer them faculty positions when the preparatory school was closed in May 1995. Plaintiffs allege that Gallaudet's failure to hire them was an act of retaliation for plaintiffs' outspoken advocacy of pedagogical methods and principles associated with the movement for "Deaf Empowerment," as well as plaintiffs' prior expression of free speech about deficiencies in Gallaudet's curriculum. Plaintiffs further allege that defendants failed to comply

with University prescribed procedures in the personnel decisions, and that this failure constitutes a violation of plaintiffs' due process rights under the Fifth Amendment as well as their contractual rights under local law.

Plaintiffs' amended complaint contains eight counts: (1) violation of due process rights pursuant to the Fifth Amendment (against all defendants); (2) violation of rights to free speech pursuant to the First Amendment (against all defendants); (3) violation of plaintiff Gemmill's rights to equal protection under the Fifth Amendment (against defendants Gallaudet and O'Connor); (4) violation of plaintiff Gemmill's rights under the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* (against defendants Gallaudet and O'Connor); (5) violation of plaintiff Gemmill's rights under the D.C. Human Rights Act, D.C.Code Ann. § 1–2501 *et seq.* (against defendants Gallaudet and O'Connor); (6) breach of employment contracts (against Gallaudet); (7) promissory estoppel (against Gallaudet); and (8) defamation (against Gallaudet). This matter is now before the Court on defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) on all but the contract claims. After briefly reviewing the history of Gallaudet and its relationship with the federal government, the Court will consider defendants' motion.

### B. Factual Background

The institution now known as Gallaudet was founded in 1856 by Amos Kendall, a local resident philanthropist who owned the Kendall Green property in Northwest Washington where the University is located. Dr. Edward Minor Gallaudet—the son of Thomas Hopkins Gallaudet, who earlier had founded the first school for the deaf in the United States—served as the first superintendent of the school.

In 1857, Congress incorporated the school as the "Columbia Institution of the Deaf and Dumb, and the Blind." [1] Ch. 46, 11 stat. 161 (1857). The original act of incorporation identified Kendall, seven other private citizens from the Washington area, and "such persons as may hereafter be associated with them, by contributions for instruction of the Deaf, Dumb and the Blind" as directors of the corporation. *Id.*

In 1868, Congress added three "public members" to the Board of Directors. The three public members were "appointed in the following manner: One senator by the President of the Senate, and two representatives by the Speaker of the House; these directors to hold their offices for the term of a single Congress, and to be eligible to a reappointment." Ch. 262, 15 Stat. 232 (1868); *see* Revised Statutes § 4863 (2d ed. 1873). In 1954, Congress approved a change to the name of the school to "Gallaudet College." The 1954 statute provided that "Gallaudet College shall be under the direction and control of a Board of Directors, composed of thirteen members"—three of whom were "public members" appointed through the same mechanism established in the 1868 Act; and "ten other members, all of whom [are] elected by the Board of Directors, who on the effective date of this Act [June 8, 1954] . . . includes those persons serving as nonpublic members of the Board of Directors of the Columbia Institution for the Deaf immediately prior to such date." *Id.* The statute further provided that the Board, by majority vote, could remove or replace any nonpublic member, and that "[s]even directors shall be a quorum to transact business." *Id.*

In 1968, Congress approved expansion of the Gallaudet Board from 13 members to 21 members. *See* Pub.L. 90–415, 82 Stat. 397 (1968). Under the 1968 statute,

---

1. The school relinquished responsibility for educating blind students in 1865, and the name was changed to "Columbia Institution for the Instruction of the Deaf and Dumb." Ch. 50, 13 Stat. 436 (1865). The name of the corporation later was changed to "Columbia Institution for the Deaf," before becoming "Gallaudet College" in 1954. The school became "Gallaudet University" in 1986. Pub.L. 99–371, 100 Stat. 781 (1986).

three of the 21 members of the expanded Board continued to be public members, while 18 were nonpublic members subject to appointment and replacement by a majority vote of the Board. *Id.* The statute increased the quorum for the Board to transact business from seven to nine.

In 1986, Congress enacted the Education of the Deaf Act, which provides the basic legal framework for Gallaudet as it exists today. *See* 20 U.S.C. § 4301 *et seq.* In addition to changing the school's name to "Gallaudet University," the 1986 statute left Gallaudet "under the direction and control of a Board of Trustees, composed of 21 members." Three of the 21 members continued to be "public members" appointed by Congress. The other 18 are "elected by the Board of Trustees, who on the effective date of this Act [August 4, 1986] shall include those individuals serving as nonpublic members of the Board of Trustees of Gallaudet College immediately prior to such date." *Id.*

Throughout its history, Gallaudet has relied upon the federal government for funding. In 1995, the University received $79 million or 73 percent of its budget through direct federal appropriations.[2] Gallaudet shares a close relationship with the federal government in other respects, as well. Since its founding, Congress has exercised significant control over Gallaudet's real property,[3] employment relationships,[4] and certain aspects of Gallaudet's admissions policies.[5] Most recently, in the Education of the Deaf Act of 1986, Congress placed Gallaudet on a five-year reauthorization schedule, and limited the number of international students Gallaudet could enroll to 10 percent of total enrollment. *See* 20 U.S.C. §§ 4359a and 4360.

Based on the relationship between the federal government and Gallaudet described above, plaintiffs have asserted constitutional claims against Gallaudet that are predicated on Gallaudet's status as a federal actor. Specifically, plaintiffs allege that defendants have violated their rights under the 5th Amendment (Counts I and III) and the 1st Amendment (Count II). Plaintiffs present two theories for why Gallaudet's actions are subject to federal constitutional restraints: (1) that Gallaudet is a government entity or, put differently, an "all-purpose federal actor," *see Kauffman v. Anglo–American School of Sofia,* 28 F.3d 1223, 1226 (D.C.Cir.1994); and (2) even if Gallaudet is not a government entity, its actions were transformed into those of the government because of Gallaudet's "symbiotic relationship" with the federal government. *See Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). These theories of government action are considered below.

## II. DISCUSSION

### A. Standard of Judgment

Under Fed.R.Civ.P. 12, a claim should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In evaluating plaintiffs' amended complaint, the Court must accept the factual allegations as true and draw reasonable inferences therefrom in favor of

---

**2.** *See Departments of Labor, Health and Human Services, Education and Related Agencies Appropriations for 1996. Part 5: Department of Education: Hearings Before the House of Representatives Committee on Appropriations,* 104th Cong., 1st Sess. 1016 (1995) (Department of Education, Gallaudet University, Fiscal Year 1996 Budget Request).

**3.** *See Constitution of the Columbia Institution for the Instruction of the Deaf and Dumb with All the Acts of Congress Relating to the Institu-* *tion from Its Organization, February 16th, 1857, to March 2, 1869,* H.R. Mis. Doc. No. 30, 41st Cong., 1st Sess. 4 (1869).

**4.** *See, e.g.,* 5 U.S.C. § 8331 *et seq.* (extending coverage of Civil Service Retirement Act of 1930 to employees of the Columbia Institution for the Deaf and Dumb).

**5.** *See* fn. 3, at 5.

plaintiffs. *Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 411, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986).

### B. Government Action

#### 1. All-purpose Federal Actor

The question of whether a government corporation is an "all-purpose" government actor is controlled by *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995). In *Lebron*, the Supreme Court considered whether Amtrak is an instrumentality of the United States for First Amendment purposes. The statute creating Amtrak designated the railroad to be a private corporation. Nevertheless, the Court determined that Amtrak was "established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees. It is in that respect no different from the so-called independent regulatory agencies. . .which are run by presidential appointees with fixed terms." *Id.* at 398, 115 S.Ct. 961. The *Lebron* Court proceeded to hold that where "the Government creates a corporation by special law, for furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for the purposes of the First Amendment." *Id.* at 400, 115 S.Ct. 961.

Several courts have read the *Lebron* holding as creating a three-part test for determining when a government-created corporation is "Government itself." *See Hall v. American Nat'l Red Cross*, 86 F.3d 919, 922 (9th Cir.1996); *Hack v. President and Fellows of Yale College*, 16 F.Supp.2d 183, 188 (D.Conn.1998); *Abu–Jamal v. National Public Radio*, No. 96–0594, 1997 WL 527349 (D.D.C. Aug.21, 1997). Under this interpretation, private corporations are government actors when the corporation is (1) created by the government by a special law; (2) for the furtherance of gov-

ernmental objectives; (3) where the government retains for itself permanent authority to appoint a majority of the board of directors. *See, e.g., Hack,* 16 F.Supp.2d at 188. Although defendants challenge this interpretation, at least one district judge in this Circuit has adopted this reading of *Lebron. See Abu–Jamal,* 1997 WL 527349 (D.D.C. Aug.21, 1997). In *Abu–Jamal,* Judge Lamberth found that the three-pronged test "comports with a common sense reading of *Lebron,* and the recurring theme in that opinion that in addition to government creation to further governmental purposes, there must be governmental control." *Id.* at *4. The court applied the three-part test to National Public Radio (NPR), the defendant in the suit, and found that NPR was not an all-purpose government actor. *Id.* The court's holding rested on the third prong of the *Lebron* test, and the fact that "[n]one of NPR's directors is selected, appointed or confirmed by any branch of the federal government, . . ." *Id.*

■ In this case, the first two prongs of the *Lebron* test are satisfied. Defendants do not dispute that Gallaudet is a congressionally created corporation that serves governmental objectives. The dispute in this case centers on the third prong; that is, whether the government has retained for itself "permanent authority to appoint a majority of the directors of [the] corporation. . ." *Lebron,* 513 U.S. at 400, 115 S.Ct. 961. Three of the 21 trustees on the Gallaudet Board are "public members" (*viz.,* one is a United States senator appointed by the President of the Senate, and two are representatives appointed by the Speaker of the House of Representatives). *See* 20 U.S.C. § 4303(a)(1)(A)(i) & (ii). The remaining 18 members are elected by the Gallaudet Board of Trustees. *Id.* § 4303(a)(1)(B).

The number of public positions on Gallaudet's Board of Trustees, which is obviously far from a majority, is a strong indication that the federal government

does not exercise sufficient control over Gallaudet for the University to be deemed a government actor.[6] That finding is further supported by the role of the Board in the management of the University. The Education of the Deaf Act of 1986 provides that the University is "under the direction and control" of Gallaudet's Board of Trustees. 20 U.S.C. § 4303(b). The statute (as amended) provides the Board with the authority, *inter alia*, to:

> appoint a president and establish policies, guidelines, and procedures related to the appointments, the salaries, and the dismissals of professors, instructors, and other employees of Gallaudet University...; [and]
>
> * * * * , * *
>
> establish such schools, departments and other units as the Board of Trustees deems necessary to carry out the purpose of Gallaudet University.

20 U.S.C. § 4303(b)(4) (1994). Thus, responsibility for managing Gallaudet is lodged firmly with the Board. The Board has authority over decisions and policies ranging from the appointment, assignment and dismissal of faculty, to the establishment or elimination of programs and other instructional units. In light of this role and the fact that the Board is predominately private, the Court holds that Gallaudet is not an all-purpose government actor subject to federal constitutional restraints.

### 2. Symbiotic Relationship

■ Plaintiffs' second theory for why defendants should be liable under the

First and Fifth Amendments is that, even if the University is not an all-purpose government actor, the conduct at the heart of this case should be regarded as government action for constitutional purposes. The Court in *San Francisco Arts & Athletics v. United States Olympic Committee*, 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987), identified three related factors as relevant to this inquiry: "(1) the nexus between the government and the challenged action, (2) whether the alleged government actor performed functions traditionally exclusively reserved to the government, and (3) whether the government coerced or encouraged the challenged action." *American Bankers Mortgage Corp. v. Federal Home Loan Mortgage Corp.*, 75 F.3d 1401, 1409 (9th Cir.1996) (citing *San Francisco Arts & Athletics*, 483 U.S. at 543–46, 107 S.Ct. 2971); *see also NCAA v. Tarkanian*, 488 U.S. 179, 192, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). Thus, the issue is the connection between the challenged conduct and the federal government. Where the government stands in close proximity to the conduct, whether through federal regulation or actual participation in the challenged activity, the action is considered governmental. Where the corporation acts on its own as any other private corporation could, however, the government has not "provided the authority that enhanced the power of the harm-causing individual actor." *Tarkanian*, 488 U.S. at 192, 109 S.Ct. 454, and the action is deemed private.

■ In this case, plaintiffs allege that Gallaudet and the federal government en-

**6.** Under a literal translation of the *Lebron* holding to the three-part test, the predominately private composition of Gallaudet's Board of Trustees would be dispositive. This Court is unconvinced, however, that congressional appointment of a majority of the directors should be a *sine qua non* for a finding of federal action. The focus of *Lebron* and its progeny is on congressional direction and control, and although the composition of the Board of Trustees is one indicator of the extent of federal control, it should not be the sole factor. The composition of Gallaudet's Board would be immaterial to the question of federal action if, for instance, Congress enacted legislation that stripped the Board of its authority to manage and set policy for the University. In such a case the court would examine the governing structure of the University from a functional perspective, as opposed to comparing the number of public and private members on the Board. *See Lebron*, 513 U.S. at 397, 115 S.Ct. 961 ("It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form.").

joy a "symbiotic relationship" such that the actions of Gallaudet must be considered governmental. In support of their position, plaintiffs reiterate many of the arguments offered under the *Lebron* test for when a private corporation constitutes a part of the government, such as Gallaudet's reliance on the federal government for its funding. Plaintiffs do not, however, establish the required link between the federal government and the specific conduct challenged in this case. There is no suggestion that Congress or any other federal agency or instrumentality played a role in the personnel decisions that are the subject of this action. By law, the Gallaudet Board of Trustees is entrusted with the responsibility to make all decisions relating to faculty appointment and to the establishment and elimination of programs at the University. *See* 20 U.S.C. § 4303(b)(4) and (6). Plaintiffs have not alleged that any agency or official of the federal government was involved in plaintiffs' termination or in any of the decisions leading up to the termination of their faculty appointments. In short, plaintiffs have failed to establish a connection between the federal government and the faculty decisions that are the subject of this action. These decisions do not, therefore, constitute federal action, and plaintiffs' First and Fifth Amendment claims cannot stand.

Plaintiffs ask this Court to deny defendants' motion to dismiss and, instead, permit discovery. Plaintiffs assert "[d]iscovery is necessary to develop a full factual record to allow this claim to be fully and fairly adjudicated." Opp. Mem. at 40. The proffered justification for permitting discovery in this case is plaintiffs' statement that the Secretary of Education "pressured the Gallaudet Board to cut costs by closing the Northwest Campus." Opp. Mem. at 39. Plaintiffs provide no citation or any other form of support for this statement. The request is therefore denied, as the Court will not allow plaintiffs to proceed to discovery on conjecture alone. *See Havoco of America, Ltd. v.*

*Shell Oil Co.,* 626 F.2d 549, 553 (7th Cir. 1980) ("if the allegations of the complaint fail to establish the requisite elements of the cause of action, [a court's] requiring costly and time consuming discovery and trial work would represent an abdication of [the court's] judicial responsibility.").

## C. ADA Claim

In Count IV of the amended complaint, plaintiff Janet Gemmill, who is deaf, alleges that defendants violated the Americans With Disabilities Act (ADA). Specifically, Gemmill asserts that defendants did not provide her with an interpreter to assist in a job interview with the elected representatives of the University English Department. Gemmill argues that this was a failure to "reasonably accommodate" her deafness in violation of the ADA.

The ADA prohibits discrimination against a "qualified individual with a disability because of such disability." 42 U.S.C. § 12112(a). "Qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. 42 U.S.C. § 12111(8). An employer discriminates against a qualified individual with a disability by

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer][.]

42 U.S.C. § 12112(b)(5).

 It is undisputed in this case that Gemmill did not request that an interpreter be provided for her interview with the University English Department. This is fatal to Gemmill's ADA claim, as the ADA does not impose a general duty on an employer to provide unrequested accom-

modations.[7] *See, e.g., Gaston v. Bellingrath Gardens & Home, Inc.,* 167 F.3d 1361 (11th Cir.1999); *Crandall v. Paralyzed Veterans of America,* 146 F.3d 894 (D.C.Cir.1998) (employee with bipolar disorder could not state a claim under the Rehabilitation Act when he never told his employer of his mental illness and never requested accommodations.); *cf. McGill v. Callear,* 973 F.Supp. 20, 23 (D.D.C.1997) (in case under Rehabilitation Act, "[p]laintiff's failure...to participate in the process of identifying appropriate accommodation is fatal to her reasonable accommodation claim."); *see also* 29 C.F.R. pt. 1630 App. § 1630.9 ("[i]n general...it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed."). The absence of this duty to provide unrequested accommodations is especially appropriate in this case, as Gemmill has not alleged that she had ever requested or made use of an interpreter in her prior dealings with members of the Interview Committee, or in her various dealings with University faculty in other settings. Accordingly, Gemmill's ADA claim is dismissed.

### III. CONCLUSION

Based on the foregoing, plaintiffs' federal claims against defendants are dismissed. In light of this determination, the Court will decline to exercise supplemental jurisdiction over plaintiffs' local law claims in Counts V–VIII. Under 28 U.S.C. § 1367(c), a district court may dismiss local law claims that are within its supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Thus, even accepting plaintiffs' argument that this Court could hear the local law claims if it desired, there is no reason to do so. Plaintiffs' claims in Counts V–VIII are based strictly on D.C. law, and are therefore appropriately heard in District of Columbia Superior Court. *See National Organization for Women v. Operation Rescue,* 37 F.3d 646, 651 (D.C.Cir.1994); *Abu–Jamal,* 1997 WL 527349 at *7. Counts V–VIII are therefore dismissed without prejudice.

An appropriate Order will accompany this Opinion.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that defendants' motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) is **GRANTED;** it is further

**ORDERED** that Counts I–IV of the amended complaint are **DISMISSED** with prejudice; it is further

**ORDERED** that Counts V–VIII are **DISMISSED** without prejudice.

**SO ORDERED.**

---

7. The legislative history of the ADA goes even further to state that an employer should not attempt to provide an accommodation unless the employee requests it: "In the absence of a request, it would be inappropriate to provide an accommodation, especially where i[t] could adversely impact upon the individual." H. Rep. No. 485(II) at 65, 1990 U.S.C.C.A.N. at 347.