**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4371
_____

GERSHWAIN SPRAUVE,

                                    Appellant

v.

THE WEST INDIAN COMPANY LIMITED;
JOSEPH BOSCHULTE;
BOARD OF DIRECTORS OF THE WEST INDIAN
COMPANY LIMITED


_____

No. 14-1151
_____

ANDREA V. SMITH,

                                    Appellant

v.

THE WEST INDIAN COMPANY LIMITED;
JOSEPH BOSCHULTE, in his personal capacity;
THE BOARD OF DIRECTORS OF THE WEST INDIAN
COMPANY LIMITED;
JOSEPH BOSCHULTE, as President and Chief Executive
Officer of the West Indian Company Limited
_____

On Appeal from the District Court
of the Virgin Islands
(Civil Action Nos. 3:13-cv-00008 and 3:13-cv-00030)
District Judge:  Hon. Susan D. Wigenton
_____

Argued:  December 8, 2014

Before:  CHAGARES, JORDAN and SHWARTZ,
Circuit Judges

(Opinion Filed: August 25, 2015)

Karin A. Bentz, Esq. (Argued)
Julita K. De León, Esq.
The Law Offices of Karin A. Bentz, P.C.
5332 Raadets Gade, Suite 3
St. Thomas, VI 00802
        Attorneys for Appellants Gershwain Sprauve and
        Andrea Smith

Micol L. Morgan, Esq. (Argued)
Bailey A. Calhoun, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, LLC
The Tunick Bldg., Suite 201
1336 Beltjen Rd.
St. Thomas, VI 00802

        Attorneys for Appellee Joseph Boschulte in his
        individual capacity

Mark D. Hodge, Esq. (Argued)
Hodge & Hodge
1340 Taarneberg
St. Thomas, VI 00802

Adriane J. Dudley, Esq.
Dudley Rich Davis LLP
5194 Dronningens Gade, Suite 3
Hibiscus Alley
St. Thomas, VI 00802

        Attorney for Appellees The West Indian Company
        Limited; Board of Directors of the West Indian
        Company Limited; and Joseph Boschulte, as President
        and Chief Executive Officer of the West Indian
        Company

―――――――――――――

OPINION

―――――――――――――

CHAGARES, Circuit Judge

Gershwain Sprauve and Andrea Smith appeal the District Court's dismissal of their cases for the failure to state a claim. The District Court found that Sprauve's and Smith's claims under the First and Fourteenth Amendments and 42 U.S.C. § 1983 failed because defendant West Indian Company, Limited ("WICO"), their former employer, is not a government entity. Applying the United States Supreme Court's decision in Lebron v. National Railroad Passenger Corporation, 513 U.S. 374 (1995), we hold that WICO must be considered a government entity for the purposes of Sprauve's and Smith's constitutional claims. For the reasons that follow, we will affirm in part, reverse in part, vacate in part, and remand for further consideration of Sprauve's and Smith's claims.

I.

We take most of the following facts from the plaintiffs' complaints, which we assume to be true for the purposes of a motion to dismiss. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). WICO was founded in 1912, prior to the United States' acquisition of the Virgin Islands from Denmark in 1917. WICO began as a coal bunkering business and later grew to serve as the "Port Agent" for the cruise lines that visit the port of Charlotte Amalie in St. Thomas. Joint Appendix ("J.A.") 3, 33. WICO also manages the Havensight Mall at that port. Id. In 1986, WICO began dredging activities in the St. Thomas harbor. Sprauve & Smith Br. 4. This led to public opposition and litigation regarding the scope of these activities. Id.

In 1993, the Government of the Virgin Islands purchased 100% of the shares of WICO through a Stock Purchase Agreement. The purchase was approved by the Legislature of the Virgin Islands in a special session in Act No. 5826 (the "Act"). J.A. 421. The Act explains that "the Government of the Virgin Islands . . . has been engaged for a

number of years in proceedings, including litigation, regarding those certain rights of [WICO]" and that "acquisition of ownership of the Company by the Government would permit the final conclusion of all such proceedings and related disputes, and ensure that the development rights of the Company conferred by . . . agreements and treaties would be subject in all respects to the control of the Government." Id. The Act further explains that acquisition of WICO would "transfer to public ownership and control substantial real estate, including certain areas that may be suitable for development for public use." Id. Section 8(b) of the Act provides:

> Upon acquisition of the Facilities and all of the issued and outstanding shares of common stock of the Company by the Government, the Company is hereby granted the status and authority of a public corporation and governmental instrumentality of the Government of the Virgin Islands of the United States and shall be deemed to be a public entity operating on behalf of the Government, rather than a private corporation . . . .

J.A. 424.

Following this acquisition, it is undisputed that 100% of WICO shares were transferred to the Virgin Islands Public Finance Authority ("PFA"), a public corporation and governmental instrumentality created by the Government of the Virgin Islands. J.A. 229–30. The PFA is run by a board of directors appointed by the Governor of the Virgin Islands, with the advice and consent of the Virgin Islands Legislature. J.A. 33. WICO is run by its own board of directors, appointed by the PFA. Id.

Plaintiff Gershwain Sprauve began working at WICO in 1997 as the Manager of Mall Operations. In 2009, WICO President and Chief Executive Officer ("CEO") Edward Thomas indicated to the WICO Board of Directors (the "Board") that he planned to retire. Sprauve submitted his application for the position and Thomas verbally recommended Sprauve for the job to the Board. In March

4

2010, the Board offered the CEO position to Sprauve, but it later reneged on this offer. In December 2010, the Board extended Thomas's contract. In 2011, Thomas again recommended Sprauve to the Board as his replacement. The Board instead convened a search committee and eventually hired defendant Joseph Boschulte as the new CEO and President of WICO. Boschulte began his tenure in that position on May 1, 2012.

Sprauve alleges that Boschulte was hostile toward him and falsely accused him of making various mistakes in the workplace. Sprauve eventually wrote a letter to the Board complaining about Boschulte's behavior. The Board launched an investigation. Shortly after this investigation, Boschulte terminated Sprauve, alleging he failed to attend a hearing before the Legislature's Finance Committee to discuss WICO's budget. Sprauve asserts that this allegation was pretext.

Plaintiff Andrea Smith began working at WICO in 1981, before the company was purchased by the Virgin Islands. In 2012, she was promoted to Chief Financial Officer. When Edward Thomas retired, she served as the Interim President and CEO of WICO until Boschulte was hired. Smith alleges that Boschulte knew that she had been interviewed by the Board as part of its investigation into Sprauve's claim and that Boschulte became angry with her. She alleges that he then took various retaliatory actions against her. On January 11, 2013, Boschulte terminated Smith for what he called "failure to execute." J.A. 38.

On January 28, 2013, Sprauve filed a complaint against WICO and Boschulte in the District Court of the Virgin Islands. He alleged violations of his First and Fourteenth Amendment rights under the United States Constitution, a claim under 42 U.S.C. § 1983 against Boschulte, and a number of claims under Virgin Islands law. WICO and Boschulte moved to dismiss Sprauve's complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Court granted the motion. J.A. 398.

Smith filed her own complaint against WICO and Boschulte alleging violations of the First and Fourteenth

5

Amendments, a claim under 42 U.S.C. § 1983 against Boschulte, and a number of claims under Virgin Islands law. WICO and Boschulte filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6) and Boschulte filed a motion to dismiss under Rule 12(b)(6). The District Court granted the motions. J.A. 393; Supplemental Appendix ("S.A.") 2.

The District Court conducted the same analysis in granting both WICO's and Boschulte's motions to dismiss. It explained that "[t]he first and central issue raised . . . is whether WICO is a public corporation with public employees versus a private entity with private employees." J.A. 405; S.A. 9. To make this determination, the District Court first looked to decisions of the Virgin Islands Public Employees Relations Board ("PERB"), which found that WICO employees are not public employees. J.A. 405–07; S.A. 9–10. Next, the District Court examined the language of the Act. J.A. 407; S.A. 10–11. The District Court ultimately concluded that "WICO cannot be considered a purely public entity," that its employees are not public employees, and that it is not a public corporation. J.A. 407–08; S.A. 11–12. The District Court then found that because WICO is not a public entity, its alleged conduct could not be considered to have been "under color of state law" for purposes of liability under section 1983, J.A. 409; S.A. 13, and that Smith and Sprauve's direct constitutional claims fail because WICO and Boschulte are private actors. J.A. 411; S.A. 14–17. Finally, the District Court declined to exercise supplemental jurisdiction over the remaining claims under Virgin Islands law. J.A. 412; S.A. 18.

Both Sprauve and Smith timely appealed.[1]

---

[1]In both Sprauve's and Smith's cases the defendants also moved to quash service of process to the WICO Board and to dismiss all claims against the Board. The District Court granted these motions and the plaintiffs have not appealed these portions of the District Court opinions. In addition, plaintiff Smith conceded that her claims for negligent misrepresentation and fraud (Count XIII) and false light (Count XIV) should be dismissed. App. 370. The District Court also dismissed Smith's free association claim (Count XVIII) on the merits, and Smith has not appealed that ruling.

II.

The District Court had jurisdiction under 28 U.S.C. § 1331, 42 U.S.C. § 1983, and 28 U.S.C. § 1343(a)(3). We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. Our standard of review for a dismissal under Federal Rule of Civil Procedure 12(b)(6) is de novo. Phillips, 515 F.3d at 230.[2]

III.

Sprauve and Smith bring claims under the First and Fourteenth Amendments and under 42 U.S.C. § 1983. To state a section 1983 claim, Sprauve and Smith must allege facts demonstrating, inter alia, that the misconduct they complain of was "under color of state law." Groman v. Twp. of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995). To state a constitutional claim, they must allege facts showing, inter alia, that the misconduct involved "state action." Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937 (1982). The "under color of state law" analysis is equivalent to the "state action" analysis. Leshko v. Servis, 423 F.3d 337, 339 (3d Cir. 2005).

The Supreme Court has acknowledged that "[i]t is fair to say that 'our cases deciding when private action might be deemed that of the state have not been a model of consistency.'" Lebron, 513 U.S. at 378 (quoting Edmonson v. Leesville Concrete Co., 500 U.S. 614, 632 (1991) (O'Connor, J., dissenting)). Armed with that body of law, we have endeavored to determine whether state action exists in circumstances including where an activity is significantly encouraged by the state, where the state acts as a joint participant, and where an actor "performs a function

---

[2] The defendants filed motions to dismiss under both Rules 12(b)(1) and 12(b)(6). The District Court purported to grant defendants' motions under 12(b)(1), but did so using a Rule 12(b)(6) analysis. Thus, we will treat the order as having been issued under Rule 12(b)(6). See, e.g., Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1408–09 (3d Cir. 1991).

7

designated by the state, or is entwined with government policies or management." Leshko, 423 F.3d at 340. We have described this process as "labyrinthine," id. at 338, "murky," Fitzgerald v. Mountain Laurel Racing, Inc., 607 F.2d 589, 591 (3d Cir. 1979), and a "protean concept," Magill v. Avonworth Baseball Conference, 516 F.2d 1328, 1331 (3d Cir. 1975) (quotation marks omitted).

However, we may avoid this determination of whether private party conduct constitutes state action when the actor is the government. See Lebron, 513 U.S. at 378 (noting that "[i]t may be unnecessary to traverse [the] difficult terrain [of private party state action analysis] in the present case, since Lebron's first argument is that Amtrak is not a private entity but Government itself"). [3] The Supreme Court's decision in Lebron sets forth guideposts for resolving whether a corporate entity may be considered the government for purposes of constitutional claims. The plaintiffs argue that WICO is a governmental entity and is therefore subject to claims under the United States Constitution and under section 1983. Applying Lebron, we agree.

A.

In Lebron, the petitioner filed a lawsuit against the National Railroad Passenger Corporation (also known as Amtrak) claiming that it had violated his First and Fifth Amendment rights. Id. at 377. Amtrak was established in 1970 by Congress, inter alia, "in order to avert the threatened extinction of passenger trains in the United States," id. at 383, and was to operate, to the extent consistent with federal law, subject to the District of Columbia Business Corporation Act, see 45 U.S.C. § 541 (1970). Amtrak later incorporated under that statute. See Lebron, 513 U.S. at 385. See also 45 U.S.C. § 541 (1970) (authorizing incorporation of Amtrak). A majority of Amtrak's governing board is appointed by the Government and Amtrak is required to submit three separate

---

[3] To repeat, we are only examining whether WICO is a government entity for the purpose of determining whether constitutional claims can be lodged directly against it. This Opinion does not address, for example, whether WICO is entitled to governmental immunities. We leave that issue for another day.

annual reports to the Government. Lebron, 513 U.S. at 385. Nonetheless, Congress provided that Amtrak "shall not be an agency, instrumentality, authority, or entity, or establishment of the United States Government." 45 U.S.C. § 541 (1970).

To give some context to its analysis, the Lebron Court first engaged in a detailed recitation of "the long history of corporations created and participated in by the United States" with a particular focus on level of control by the Government. Lebron, 513 U.S. at 386. The first such corporation was the Bank of the United States, created in 1791, but the Government's participation in that corporation was limited to holding twenty percent of the Bank's stock. Id. at 386–87. The Government first participated in a corporation in which it appointed a majority of the corporation's directors – thus controlling the corporation – in 1902. Id. at 387. Congress that year authorized the President to acquire the assets of the New Panama Canal Company of France, including its holdings in the Panama Railroad Company – much like Act No. 5826 authorized the Government of the Virgin Islands to acquire WICO. See id. The purpose of the purchase was "to facilitate construction of the Panama Canal." Id. The Government "became the sole shareholder of the Panama Railroad, and continued to operate it under its original charter, with the Secretary of War, as the holder of the stock, electing the Railroad's 13 directors." Id. By the end of World War II, the number of Government corporations had grown to fifty-eight, and immediately after that war, many of those corporations were dissolved because of Congress's perception that "Government-created and -controlled corporations had gotten out of hand in both their number and their lack of accountability." Id. at 389. A new wave of Government corporations began again in the 1960s and, starting in 1962, these corporations were largely designated not to be Government agencies. Id. at 390. Congress intended that these new Government corporations (such as the Communications Satellite Corporation (Comsat)) would compete in the private sector, "unhindered by the restraints of bureaucracy and politics." Id. at 391. Despite being labeled as not Government entities, governance structures varied in these new Government corporations. While Comsat's board was controlled by twelve privately-appointed directors (and three appointed by the President), other Government

9

corporations such as the Corporation for Public Broadcasting, the Legal Services Corporation, and Amtrak, gave voting control to Government appointees. Id.

Amtrak's first argument to the Court in Lebron was that Congress's disclaimer of Amtrak's Government agency status was dispositive of Lebron's constitutional claims. The Court acknowledged that this disclaimer of status was controlling for matters within Congress's control. Id. at 392. The Court noted that such matters include waivers of sovereign immunity and whether statutes such as the Administrative Procedure Act and laws regarding Government procurement apply to the entity. However, the Court held that Congress could not determine whether Amtrak was a Government entity for purposes of constitutional claims. Id. The Court reasoned that "[i]f Amtrak is, by its very nature, what the Constitution regards as the Government, congressional pronouncement that it is not such can no more relieve it of its First Amendment restrictions than a similar pronouncement could exempt the Federal Bureau of Investigation from the Fourth Amendment." Id. As a result, the Court rejected Amtrak's first argument.[4]

The Lebron Court acknowledged that the question of whether Amtrak could be considered a Government agency or instrumentality for the purpose of constitutional claims against it was not answered by a statute or by prior caselaw. Id. at 394. So, the Court analyzed two factors to answer this question. First, the Court noted that Amtrak was established by a special statute for the purpose of furthering governmental goals. Id. at 397. Second, consistent with other parts of the opinion, the Court focused heavily on

_____

[4] Our Court has similarly observed that labels alone are not dispositive of the state actor issue and emphasized that we look to the "reality over the form" of the nature of the state actor's relationship with the state. Leshko, 423 F.3d at 342 (concluding foster parents are not state actors despite a Pennsylvania law that designates them public employees). Thus, we consider facts, rather than labels to determine whether an entity or person is a state actor for section 1983 purposes.

control of the corporation. Id. at 397–98. An important measure of control to the Court was whether a majority of the governing body of the corporation was appointed by the federal or state government. Id. For instance, the Court noted that in Pennsylvania v. Board of Directors of City Trusts of Philadelphia, 353 U.S. 230 (1957) (per curiam):

> we held that Girard College, which has been built and maintained pursuant to a privately erected trust, was nevertheless a governmental actor for constitutional purposes because it was operated and controlled by a board of state appointees, which was itself a state agency. Amtrak seems to us an a fortiori case.

Lebron, 513 U.S. at 397 (citation omitted). Another measure of control was its duration. The Court recognized that six of Amtrak's eight externally-named directors were appointed by the Government and that this control was not merely temporary. Id. at 397–98. As a result, the Court held "that where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." Id. at 400.

B.

1.

Applying the Lebron decision to the facts of this case, we note first that WICO was established as "a public corporation and governmental instrumentality of the Government of the Virgin Islands of the United States,"[5] J.A.

---

[5] It is immaterial to our analysis that WICO existed as a private corporation before it became a public corporation of the Virgin Islands. See Hall v. Am. Nat'l Red Cross, 86 F.3d 919, 921 (9th Cir. 1996) (holding that "[t]he first part of the Lebron test is satisfied" where "[t]he Red Cross originated as a private corporation, organized under the laws of the District of Columbia in 1881 [and] Congress reincorporated the Red Cross in 1905 . . . ."); Becker v. Gallaudet Univ., 66 F. Supp.

11

61, in a special session of the Twentieth Legislature of the Virgin Islands in 1993. J.A. 58–63 (Act No. 5826).[6] The government of the Virgin Islands took this action to further several government objectives. See Horvath v. Westport Library Ass'n, 362 F.3d 147, 153 (2d Cir. 2004) (determining that "the Library was created by a special act of the Connecticut State legislature and there is no doubt that the provision of library services is a legitimate statutory objective" and holding that "the Lebron standard has been satisfied."); Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 84 (2d Cir. 2000) (holding that the first part of Lebron was "easily satisfied [because] the State of Connecticut created the corporate entity by special law, and higher education is a governmental objective (although not the exclusive province of government)"), abrogated on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002). See generally Clark v. Cnty. of Placer, 923 F. Supp. 1278, 1284 (E.D. Cal. 1996) ("[A]ll that is required for the purpose of § 1983 liability under Lebron is that the corporation have a 'public statutory mission.'") (citation omitted).[7]

---

2d 16, 18, 20 (D.D.C. 1999) (determining that the first Lebron factor was satisfied although the institution was founded privately in 1856 and incorporated by Congress in 1857); Clark v. Cnty. of Placer, 923 F. Supp. 1278, 1283 n.8 (E.D. Cal. 1996) ("The court does not regard the fact that at one time the PCFA operated free of the county as a significant distinction between the matter at bar and Lebron.") (citation omitted). See also Lebron, 513 U.S. at 397 (noting a prior case where Girard College, which was founded and maintained through a privately erected trust, was held to be a governmental actor (citing Bd. of Dirs. of City Trusts of Phila., 353 U.S. at 231)).

[6] We have recognized "that in deciding a motion to dismiss, courts generally may consider only the allegations contained in the complaint, exhibits attached thereto, and matters of public record." Beverly Enters., Inc. v. Trump, 182 F.3d 183, 190 n.3 (3d Cir. 1999). The materials cited herein fit within those parameters.

[7] By way of background, Denmark granted WICO land "located in the Long Bay area of the St. Thomas Harbor and

12

One government objective of Act No. 5826 was to resolve all disputes – including litigation – between the Virgin Islands and WICO. J.A. 58. Another government objective of the Act was to ensure WICO's development rights were "subject in all respects to the control of the Government." Id. Still another government objective was to "transfer to public ownership and control substantial real estate, including certain areas that may be suitable for development for public use, as well as areas that may produce income . . ." Id. See J.A. 61 ("It is hereby resolved and declared that the purchase of the Facilities pursuant to this Act, and the operation and maintenance of the Facilities, and the collection of the revenues derived from the operation of the Facilities . . . constitute public purposes.").

Second, the Virgin Islands government clearly has permanent[8] and complete control over WICO as a result of

other areas in Charlotte Amalie in the United States Virgin Islands," J.A. 64, along with buildings and improvements on the land, as well as "rights to reclaim and develop certain submerged lands in the St. Thomas Harbor," id., and that grant was preserved when Denmark ceded the Virgin Islands to the United States in 1917. West Indian Co, Ltd. v. Gov't of V.I., 643 F. Supp. 869, 870 (D.V.I. 1986). See J.A. 68 (noting WICO's rights over "wharves, docks, piers, slips, [and] retaining walls."). WICO and the Virgin Islands had many disputes between them over the course of time. See Alexander A. Farrelly, Governor of the United States Virgin Islands, State of the Territory Address at the Senate Chambers, 12 (Jan. 14, 1993) (noting WICO's "controlling rights of Charlotte Amalie's harbor . . . has been a source of great concern to all of us. Repeatedly, various attempts by this government to exercise some degree of regulation and regain control over this strategic port of entry have been thwarted by the treaty stipulations and the courts."). For instance, as discussed earlier, WICO's dredging operations were hotly contested between the parties. See West Indian Co., 643 F. Supp. at 870–84.

[8] The Lebron Court noted that temporary Government control would not satisfy the second, or control, factor. See 513 U.S. at 395. Accordingly, the requisite control of a corporation

the Act. Specifically, the Board is composed of nine directors. West Indian Co. Ltd. Fiscal Year 2015 Budget Hearings Post Audit Div., Comm. on Fin., 30th Legis. 2 (2014) (Report of Jose L. George, Post Auditor). The parties do not dispute that all of these directors are appointed by the PFA. See id. (noting that the Act directed the Governor of the Virgin Islands to transfer all of the WICO's stock to the PFA); J.A. 60 (same). See generally Hack, 237 F.3d at 84 (holding that the Lebron control factor was not met and noting "[t]wo of nineteen board members is . . . a long way from control"); Hall v. Am. Nat'l Red Cross, 86 F.3d 919, 921–22 (9th Cir. 1996) (applying Lebron and holding that the Government did not control the Red Cross because the Government appoints only eight of fifty-three on the governing board); Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de P.R., 84 F.3d 487, 492 (1st Cir. 1996) (determining that Lebron control factor not met because "the government of Puerto Rico does not retain the power to appoint any of [the corporation's] directors"); Am. Bankers Mortg. Corp. v. Fed. Home Loan Mortg. Corp., 75 F.3d 1401, 1407 (9th Cir. 1996) (applying Lebron and holding that the Government's control over Freddie Mac was missing because the "government is entitled to appoint fewer than one-third of Freddie Mac's directors"); Wilkinson v. Legal Servs. Corp., 27 F. Supp. 2d 32, 45 (D.D.C. 1998) (holding that Lebron control factor was met

---

does not exist where "the Government exerts its control [] as a creditor," id., where "a provision exists that will automatically terminate control upon termination of a temporary financial interest," id., or where the Government is acting as a conservator, Garcia v. Fed. Nat'l Mortg. Corp., 782 F.3d 736, 744 (6th Cir. 2015) (Donald, J., concurring) (noting holdings in Lebron and Mik v. Fed. Home Loan Mortg. Corp., 743 F.3d 149 (6th Cir. 2014) that "a necessary condition precedent to consider a once-private entity a state actor is that the government has 'permanent' control over the entity," and concluding that "FHFA's conservatorship of Freddie Mac . . . is, by definition, temporary"). It is undisputed that the Virgin Islands' control of WICO is permanent.

because "LSC's Board is composed entirely of political appointees").[9]

Accordingly, the factors set forth in Lebron are met and, therefore, WICO is an agency or instrumentality of the Virgin Islands and subject to the constraints of the Constitution.

2.

The defendants argue that WICO should not be considered a government entity because WICO employees, unlike other government employees, "are not beneficiaries of the Government Employees' Retirement System, are not covered by the Personnel Merit System, are not subject to the jurisdiction of the Public Employees Relations Board, and are not hired through the Division of Personnel." WICO Br. 17. We are not persuaded by this argument. The Lebron decision counsels that while statutes may be dispositive of matters within government control, "such as the Administrative Procedure Act . . . and the laws governing Government procurement," 513 U.S. at 392, reliance on such statutes to determine the constitutional rights of citizens is "misplaced." Id.[10] Indeed, a comparison of the facts of Lebron with the

---

[9] We note that several courts have held the Lebron factor of control was met in the absence of the government having the right to appoint a majority of a corporate entity's governing board where there exist other indicia of government control. See, e.g., Horvath, 362 F.3d at 153 (holding that although "it is correct that only one-half, and not a majority, of the Library's trustees are appointed by the Town . . . [t]he additional fact that [almost nine tenths] of the Library's funding comes from . . . the Town convinces us that the Town maintains sufficient control over the Library"); Becker, 66 F. Supp. 2d at 21 n.6 (holding that the composition of the governing board was not the "sole factor" determining government control).

[10] The appellees' statement that WICO employees "are not subject to the jurisdiction of the Public Employees Relations Board ['PERB']," WICO Br. 17, refers to two decisions by the PERB regarding its limited jurisdiction. Insofar as neither PERB decision considered claims under the Constitution, we

15

present case shows why the appellees' argument must be rejected. While the appellees here ask us to assume the Virgin Islands intended that WICO be considered a private entity because WICO employees are treated differently than other government employees in several respects and ask us essentially to ignore the clear language of the Act providing that WICO is "a public corporation and governmental instrumentality of the Government of the Virgin Islands of the United States," Congress explicitly provided that Amtrak was not a government entity. Despite Congress's clear direction, the Court in Lebron held that Amtrak was to be considered a Government entity for purposes of claims under the Constitution. Id. at 400. See Wilkinson, 27 F. Supp. 2d at 44, 45 (holding that where Congress provided that the Legal Services Corporation in all but several respects "should be treated as a private, non-profit corporation," it is outside Congress's authority "to make the final determination of LSC's status as a government entity for purposes of determining the constitutional rights of citizens affected by its actions.") (citing Lebron, 513 U.S. at 392). WICO is similarly a government entity for purposes of plaintiffs' constitutional claims.

The defendants also seize upon language in the Act providing that WICO is empowered to take action "under the general business corporation laws of the Virgin Islands," J.A. 60, unless such laws are inconsistent with the Act. J.A. 61. This, they contend, means that WICO operates as a private company and should be treated as such. WICO Br. 23. This argument is also foreclosed by the Supreme Court's decision in Lebron. In Lebron, the Court explained that Amtrak "is subject to the provisions of [the District of Columbia Business Corporation] Act only insofar as the [Act creating

---

need not consider them. See Richards v. City of Lowell, 472 F. Supp. 2d 51, 71 n.9 (D. Mass. 2007) (conducting an analysis under Lebron and noting "[t]he City has cited a number of cases to support its argument that the GLWIB was not a municipal agency and [the plaintiff] was not a City employee. None of these cases addresses the question of whether, for constitutional purposes, actions taken by employees of a workforce investment board may be fairly attributable to the City.") (citation omitted).

16

Amtrak] does not provide to the contrary." 513 U.S. at 385. The Court in Lebron was not persuaded by this feature of Amtrak's corporate structure and, indeed, the Court admonished that "[i]t surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." Id. at 397. We therefore reject the defendants' argument.

*      *      *      *      *

Because WICO was established as a government corporation pursuant to a special Act of the Virgin Islands Legislature to further government objectives, and WICO is permanently and completely controlled by government appointees, it is part of the government for purposes of the constitutional claims and section 1983 claims brought by Sprauve and Smith.[11]

---

[11] Because our decision reverses the basis on which the District Court declined to exercise supplemental jurisdiction over Sprauve's and Smith's state law claims, we will also vacate that portion of the order and remand to the District Court to give it an opportunity to consider exercising its jurisdiction over those claims. See Trinity Indus. v. Chicago Bridge Co., 735 F.3d 131, 141 (3d Cir. 2013).

We express no opinion as to the merits of the remaining claims in this case, except as to the appellants' direct constitutional claims against Boschulte in his personal capacity. These claims are duplicative of their section 1983 claims against him. They arise from the same basic events— Sprauve's and Smith's respective terminations—and raise substantially the same allegations. See, e.g., J.A. 40, 45 (Smith alleging in Count VII, under section 1983, that her due process rights were violated when her employment was terminated by Boschulte "without affording [her] notice or opportunity to be heard" and Count II, alleging that under the Fourteenth Amendment that WICO, the Board, and Boschulte, in both his personal and professional capacities "engaged in a continuing course of conduct" that deprived her of her due process rights "by not affording [her] [notice] and opportunity to be heard before terminating her employment.")

17

IV.

For the foregoing reasons, we will affirm the District Court's orders in part, reverse in part, vacate in part, and remand for further consideration of Sprauve's and Smith's claims consistent with this opinion.

---

As we held in Capogrosso v. Supreme Court of New Jersey, "[i]nasmuch as § 1983 affords a remedy for infringement of one's constitutional rights, identical claims raised under the Fourteenth Amendment are redundant, rendering the outcome of the § 1983 claims dispositive of the independent constitutional claims." 588 F.3d 180, 185 (3d Cir. 2009); see also Rogin v. Bensalem Twp., 616 F.2d 680. 686 (3d Cir. 1980) (in the context of the Fourteenth Amendment, "it would be a redundant and wasteful use of judicial resources to permit the adjudication of both direct constitutional and § 1983 claims where the latter wholly subsume the former."). Because section 1983 affords the appellants a remedy against Boschulte in his personal capacity for the due process and equal protection claims they have brought under the Fourteenth Amendment, we will affirm the dismissal of these direct constitutional claims against him as redundant. Applying the same reasoning, because section 1983 similarly affords the appellants a remedy against him in his personal capacity for the free speech and free association claims they brought under the First Amendment, we will also affirm the dismissal of these direct constitutional claims against Boschulte.