In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 13-1558, -1559, -1611, -2739

DEKALB COUNTY, *et al.*,

*Plaintiffs-Appellants*,

*v.*

FEDERAL HOUSING FINANCE AGENCY, *et al.*,

*Defendants-Appellees*,

and

UNITED STATES OF AMERICA,

*Intervening-Appellee*.

---

Appeals from the United States District Court for the
Northern District of Illinois, Western Division.
Nos. 12 C 50227, 50230 — **Frederick J. Kapala**, *Judge*.
Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:12-cv-00732-CNC — **Charles N. Clevert, Jr.**, *Judge*.

---

ARGUED DECEMBER 12, 2013 — DECIDED DECEMBER 23, 2013

---

Before BAUER, CUDAHY, and POSNER, *Circuit Judges*.

POSNER, *Circuit Judge*. These consolidated appeals, by Illinois counties, the state of Illinois, and a Wisconsin county, present a common question, to which the answer given by the district courts was "no." It is whether a state and its local subdivisions (counties, in this case) can levy a tax on sales of real property by Fannie Mae (official name: Federal National Mortgage Association) and Freddie Mac (Federal Home Loan Mortgage Corporation), a similar entity that, to simplify our opinion, we'll largely ignore. (So except where otherwise indicated, whenever we say Fannie this should be understood to mean Fannie plus Freddie.) The plaintiffs' grounds are both statutory and constitutional, and it is because there is a constitutional challenge to a federal statute (actually two statutes—Fannie's and Freddie's) that the United States has intervened as an additional appellee. See 28 U.S.C. § 2403(a); Fed. R. Civ. P. 24(a)(1).

Fannie Mae was created by Congress in 1938 to bolster the housing market by providing federal money to finance home mortgages. It was tasked by Congress with buying mortgages from banks that had made mortgage loans, thus pumping money into the banking industry that could be used to make more such loans. At the outset Fannie Mae was a federal agency, federally financed. Its charter, which defined its function (just described), provided that it was exempt from state or local taxation, except real property taxation. See National Housing Act Amendments of 1938, Pub. L. No. 75-424, 52 Stat. 8, 24. In 1968 Congress converted Fannie to a private corporation, but its charter, and therefore its function (to support the home-mortgage market, toward the end of creating a "nation of homeowners," in President Roosevelt's words), were unchanged. See Housing and Urban Development Act of 1968, Pub. L. No. 90-448, 82 Stat. 476,

536 (codified, as amended, at 12 U.S.C. §§ 1716 *et seq*). No longer a government-owned corporation, it was now what is called a "Government-Sponsored Enterprise." But like Fannie's original statute (with a few changes irrelevant to the present case), the new statute made "the corporation [i.e., Fannie], including its franchise, capital, reserves, surplus, mortgages or other security holdings, and income … exempt from all taxation now or hereafter imposed by any State … or local taxing authority, except that any real property of the corporation shall be subject to State … or local taxation to the same extent as other real property is taxed." 12 U.S.C. § 1723a(c)(2).

Freddie Mac was created two years later, as a private corporation with the same tax exemption as Fannie. See 12 U.S.C. § 1452(e). For purposes of the appeals, the two companies are virtually identical. That is why, as we said at the outset, we can largely ignore Freddie, instead pretending that Fannie and Freddie are not merely Tweedledum and Tweedledee, but Tweedledumdee. (For a brief biography of Fannie, Freddie, and their relatives—like Ginnie Mae—see Office of the Inspector General, Federal Housing Finance Agency, "History of the Government Sponsored Enterprises," http://fhfaoig.gov/LearnMore/History, visited Dec. 19, 2013.)

Fannie traditionally followed conservative mortgage financing practices, and foreclosures by it were very few. But beginning in 1995 and accelerating throughout the early 2000s, it bought risky mortgages and got caught up in the housing bubble; and when the bubble burst in September 2008, Fannie found itself owning an immense inventory of defaulted and overvalued subprime mortgages. In fact it

went broke, and since 2008 has been in conservatorship. The conservator is its regulatory agency, the Federal Housing Finance Agency—hence the agency's presence in these appeals as a party. See Office of the Inspector General, Federal Housing Finance Agency, "Conservatorship FAQs," http://fhfaoig.gov/LearnMore/FAQ (visited Dec. 19, 2013). A conservatorship is like a receivership, except that a conservator, like a trustee in a reorganization under Chapter 11 of the Bankruptcy Code, tries to return the bankrupt party to solvency, rather than liquidating it. (Fannie and Freddie probably are not subject to the Bankruptcy Code and thus not eligible for Chapter 11 reorganization. For a thoughtful discussion, see Richard Scott Carnell, "Handling the Failure of a Government-Sponsored Enterprise," 80 *Wash. L. Rev.* 565, 609–12 (2005).

The hit that Fannie took beginning in 2008 coincided with the decline in states' fiscal fortunes caused by the effect on their tax base of the financial crisis and ensuing economic depression. So at the same time that Fannie found itself for the first time making frequent sales of property that it had foreclosed on (since the owner of the mortgage usually obtains title to the mortgaged property in the event of a default), the states (including their subdivisions, such as counties) found themselves in dire need of additional tax revenues but reluctant to impose or increase taxes that would drive businesses and people to lower-tax states.

Illinois and Wisconsin, like all the other states, have a tax, called a real estate transfer tax, applicable when real property changes hands. Illinois's tax is 50 cents for every $500 of the property's total value. 35 ILCS 200/31-10. Illinois counties are allowed to piggyback on the state tax by imposing their

own real estate transfer tax of 25 cents per $500 of value. 55 ILCS 5/5-1031(a). Wisconsin counties get to keep 20 percent of the revenue from the Wisconsin real estate transfer tax, which is 30 cents per $100 of value. Wis. Stat. §§ 77.22(1), 77.24. Wisconsin imposes the tax explicitly on the seller, as is normal for sale or other excise taxes. This is customary in Illinois as well, but not explicit in the statute authorizing the real estate transfer tax and so it is conceivable that Illinois might try to impose the tax on buyers of property from Fannie if it can't impose it on Fannie itself. (The indirect effect, however, might be to reduce the price that Fannie could get for property that it sold.)

Illinois and its subdivisions and many other states and their subdivisions (such as Milwaukee County) decided to impose the real estate transfer tax on Fannie's sales of foreclosed property to home buyers notwithstanding Fannie's statutory exemption from state taxation. There was no danger that taxing Fannie would drive people or businesses out of a state, and the number of foreclosures made it possible that the imposition of such a tax on Fannie would produce significant revenue for a state and its counties.

Fannie's exemption is from "all taxation" except real property taxation, and a tax on a real estate sale is a tax not on property but on the transfer of property—a well-recognized distinction. See, e.g., *United States v. Wells Fargo Bank*, 485 U.S. 351, 355 (1988); *Fernandez v. Wiener*, 326 U.S. 340, 352 (1945); Erik M. Jensen, "The Apportionment of 'Direct Taxes': Are Consumption Taxes Constitutional?," 97 *Colum. L. Rev.* 2334, 2365–66 (1997). The distinction is part of the historical distinction (found in the Constitution) between "direct" and "indirect" taxes. The former term now em-

braces just capitation taxes (taxes per head, such as a poll tax—"poll" being a Middle English word for "head") and taxes on real and personal property, and the latter term embraces all other taxes, see *Hylton v. United States*, 3 U.S. 171, 175 (Chase, J.), 176 (Paterson, J.), 183 (Iredell, J.) (1796); *Murphy v. IRS*, 493 F.3d 170, 181 (D.C. Cir. 2007); Jensen, *supra*, at 2393–97, including therefore real estate transfer taxes.

Article I, § 9, cl. 4 of the Constitution requires that direct taxes be apportioned among the states according to population. Indirect taxes—various forms of excise tax, including sale or transfer or inheritance taxes—were thought not to require apportionment because, as Hamilton argued in *The Federalist* No. 21 (*Federalist*, George W. Carey & James McClellan eds. 1990, p. 105), the market could be relied on to prevent excessive excise taxation, as excise taxes add to the price of goods and services. (The Sixteenth Amendment removed income taxes from the class of taxes that require apportionment.) The "direct"-"indirect" terminology relates to Hamilton's point. A sales tax is "indirect" because the tax is imposed on the seller, and he will try and usually succeed in passing on a portion, sometimes the entirety, of the tax to his customers by folding the tax into the price of the good sold. The result is that the "real" taxpayer is, at least to a large extent, not the nominal taxpayer (the seller), but the nominal taxpayer's customer. Jensen, *supra*, at 2393–96.

The appellants argue that the statutory term "all taxation" does not include excise taxes. The appellees reply that "all" means "all" (unless explicitly qualified, as by "all except," which is what the Fannie Mae statute does with real property taxation). That isn't always true, however; often there are implicit exceptions. If a sign reads "All vehicles

must be out of the park grounds by 8 p.m.," this doesn't necessarily include police cars and other public safety vehicles. See H.L.A. Hart, "Positivism and the Separation of Law and Morals," 71 *Harv. L. Rev.* 593, 606–07 (1958). But the taxation provision in the Fannie Mae statute is not comparable. It says "all taxation … except" taxes on real property, and having carved an express exception for one type of tax Congress could be expected to make an express exception for any other type of tax that it wanted state and local governments to be permitted to levy on Fannie.

Moreover, had states wanted to be permitted to tax property sales by Fannie, why wouldn't Congress have included an express exception from the exemption for such taxation in the 1968 statute? After all, members of Congress are well attuned to the financial interests of the states and localities they represent. See, e.g., *The Federalist* No. 36 (Hamilton) (pp. 173–74 of *Federalist*, *supra*). They may have felt that their constituents would be disserved by allowing state taxation of Fannie, because by increasing Fannie's costs it would reduce its ability to purchase mortgages, to the detriment of the state's home buyers.

Against this the appellants argue that to "all taxation" exemptions there is a well-recognized (albeit implicit) exception for excise taxes, which, they say, was codified in the Supreme Court's decision in *United States v. Wells Fargo Bank*, *supra*, but was so well-established by earlier case law that it must have been implicit in the statute that converted Fannie to a private corporation. They are wrong. *Wells Fargo* construed a federal statute that provided that certain "project notes" (obligations, for present purpose equivalent to bonds, issued by state and local authorities to finance housing pro-

jects) "shall be exempt from all taxation now or hereafter imposed by the United States." The Court held that the exemption did not apply to federal estate tax on a bequest of project notes, because such a tax is an excise tax and the "all taxation" exemption was intended only for "direct taxation," namely (since head taxes are out of favor) a property tax. 485 U.S. at 355–56. The project notes were property, and so could not be taxed by for example requiring the owner of the notes to pay a specified amount in tax every year, like a tax on real estate. But the *transfer* of the notes, as by bequest or sale, was not property and so could be taxed.

The appellants latch on to the fact that the exception the Court recognized for transfer taxes was not express; the statute said "all taxation" and not "all taxation except transfer taxes." But they misread the statute. It said that the project notes *themselves* were nontaxable—not that their transfer was nontaxable. The Court was saying that an exemption from property taxes, such as a tax on project notes, is not an exemption from transfer taxes as well, because a transfer tax is not a property tax even when the transfer is of property.

Had the Supreme Court meant to hold that the term "all taxation" means just property taxation—a very strange reading, equivalent to interpreting "all soup" to mean "all lobster bisque"—it would have had to overrule *Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95 (1941). In that case the Court had held that a statute which stated that "every Federal land bank … shall be exempt from Federal, State, municipal, and local taxation, except taxes upon real estate held, purchased, or taken," *id.* at 96 n. 1, exempted land banks from sales taxes on property that they bought. *Id.* at 99–100. *Wells Fargo* does not even cite *Bismarck*.

Fannie's tax exemption, like that of the federal land banks in *Bismarck*, exempts an entity—Fannie—and not just its property, which was the issue in *Wells Fargo*. For an excise tax, such as the real estate transfer tax, is a tax imposed on the entity, rather than just on the entity's property. Of course the entity pays the tax in both cases (though in the case of the excise tax the entity may as we noted shift the burden of the tax to its customers), but the cases distinguish between exempting the entity from all taxes not specifically excepted from the exemption, and a tax limited to a specific activity or specific assets of the entity.

The structure of the real-property exception to Fannie's tax exemption is different from the (implicit) exception in *Wells Fargo*, because the statute lists what is exempt: "the corporation, including its franchise, capital, reserves, surplus, mortgages or other security holdings, and income." Because the list consists largely of different forms of property, and "capital" might be thought to include Fannie's real estate, prudence required making the exception for real property express. There is no suggestion in the Fannie Mae statute of an exception for *transfers* of real property.

But why the exception for real property? The parties do not tell us (maybe they don't know). We conjecture that it's because state and local government provides a variety of services to buildings (police and fire protection, for example), financed to a considerable extent by taxes on real property. It would seem odd, and even rather petty, for the federal government to say we want those services for our buildings but we don't want to pay for them. It would be especially odd for Fannie to enjoy an exemption from real estate taxes on houses that it had obtained in foreclosure sales.

But this is a detail. The important point is that, as is plain from reading *Wells Fargo*, and plainer still when it is read in conjunction with *Bismarck*, the Fannie Mae statute exempts Fannie from real estate transfer taxes levied by state or local government, as has been held by the only other federal court of appeals to have addressed the issue: *County of Oakland v. Federal Housing Finance Agency*, 716 F.3d 935 (6th Cir. 2013). (Illinois and Wisconsin are not the only states that in recent years have tried to impose their real estate transfer taxes on Fannie and Freddie.)

Milwaukee County argues in the alternative that its real estate transfer tax is a property tax and is therefore excluded from Fannie Mae's tax exemption. The Wisconsin statute imposes "on the grantor of real estate a real estate transfer fee … [that] shall be collected by the [county] register [of deeds] at the time the instrument of conveyance [ordinarily a deed] is submitted for recording." Wis. Stat. § 77.22(1). (There is no contention that "fee" bears a different meaning in the statute from "tax.") The County states in its opening brief that "the term 'real property' includes deeds recorded by [Fannie] because deeds are 'indispensable' to ownership of real property." No. A deed is not real estate, any more than a car title is a car. And in neither its opening brief nor its reply brief does the County cite *Wells Fargo*, and it cites *Bismarck* only in a quotation from the district court's opinion.

The appellants' fallback position is that if (as we have just held) the Fannie Mae statute does exempt Fannie from transfer taxes, the statute is unconstitutional. We confine our discussion to the appellants' non-frivolous constitutional arguments.

The constitutional basis for the statute is the commerce clause, and it is obvious that the home mortgage market is nationwide, and indeed worldwide, with home mortgages being traded in vast quantities across state lines. But the appellants argue that statutes authorized by the commerce clause must be subordinated to state and local tax statutes because taxation is fundamental to state sovereignty. Wrong. No provision of the Constitution insulates state taxes from federal powers granted by the Constitution, which include of course the power of Congress "to regulate Commerce with foreign Nations, and among the several States … ." Art. I, § 8, cl. 3. The argument made by the appellants in this case was rejected by the Supreme Court in *Brown v. Maryland*, 25 U.S. (12 Wheat.) 419, 448–49 (1827) (Marshall, C.J.), and in an unbroken line of decisions since. See, e.g., *CSX Transportation, Inc. v. Georgia State Board of Equalization*, 552 U.S. 9, 20–22 (2007); *Exxon Corp. v. Hunt*, 475 U.S. 355, 376 (1986); *State Board of Insurance v. Todd Shipyards Corp.*, 370 U.S. 451, 456 (1962).

It's true that the Constitution presupposes the existence of the states and their quasi-sovereign status (although the reference to "We the People" in the preamble makes clear that the Constitution, unlike the Articles of Confederation that preceded it, is not a compact of the states), and that for Congress to outlaw all state taxation, leaving the states at the complete fiscal mercy of the federal government, would destroy the vestiges of sovereignty that states possess. But in contrast to that Doomsday scenario, the appellants cannot even tell us how much money they hope to collect from imposing transfer taxes on Fannie.

It's true that out of respect for state quasi-sovereignty (quasi because of course the states are not independent nations) the Supreme Court has ruled that a federal statute preempts state taxation "only if that result is 'the clear and manifest purpose of Congress.'" *Department of Revenue of Oregon v. ACF Industries, Inc.*, 510 U.S. 332, 345 (1994) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The word "manifest" in the formula adds emphasis, not meaning. The scope of the exemption in the Fannie Mae statute could not be clearer.

The appellants acknowledge as they must that a state or local government can't tax a federal agency. E.g., *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819) (Marshall, C.J.) (because "the power to tax involves the power to destroy"); *United States v. New Mexico*, 455 U.S. 720, 730 (1982). So it couldn't tax Fannie when it was a federally owned corporation; but it can now, the appellants argue, because it's privately owned. We doubt that Fannie lacks the protection of the implied constitutional immunity from state taxation, created by *McCulloch*. (We'll come back to this point momentarily.) But if it does, that would make no difference; for Fannie is not invoking the implied constitutional immunity created by *McCulloch* but rather an express statutory immunity. See *First Agricultural Nat'l Bank of Berkshire County v. State Tax Comm'n*, 392 U.S. 339, 341 (1968). The appellants argue that the constitutional and statutory exemptions must be identical. That is nonsense; it would curtail Congress's power under the commerce clause, with no basis in the Constitution. See *Arizona Dep't of Revenue v. Blaze Construction Co.*, 526 U.S. 32, 35–36 (1999); *Carson v. Roane-Anderson Co.*, 342 U.S. 232, 233–34 (1952).

The reason we doubt that the conversion stripped Fannie of its implied constitutional tax exemption is that if Fannie was a "federal instrumentality" before its privatization—as clearly it was—and was therefore, as the appellants concede, immune then from taxation by virtue of the *McCulloch* line of cases, it is a federal instrumentality now. Congress's purpose in creating Fannie in the first place—to expand home-mortgage lending in the United States—remains federal policy, and therefore remains the policy that private Fannie is obligated, as its sole mission, to promote. Its charter was unchanged when Fannie was privatized, and can't be altered by Fannie—only by Congress, for the charter is statutory. See Housing and Urban Development Act of 1968, Pub. L. No. 90-448, 82 Stat. 476, 536–46, (codified, as amended, at 12 U.S.C. §§ 1716 *et seq*). Fannie could not, without persuading Congress to revise its charter, decide that it would be a more profitable company if it filmed financial thrillers, financed for-profit no-kill cat shelters, or built and sold perpetual-motion machines, than if it continues to just finance home buying. Fannie was privatized in the hope (fulfilled for a time, then shattered by the housing and credit bubbles of the 2000s and the ensuing financial crisis) of making it more efficient in pursuit of the federal policy that its charter requires it to pursue. The appellants want to make federal government less flexible by insisting on a rigid distinction between types of federal instrumentality. Congress could in 1968 have expanded Fannie's resources in a variety of ways, including taxation; it chose to make it a private company so that it could raise money in equity markets. The objective was governmental, and unchanged; only the means of achieving it was changed.

Freddie was private from the beginning, but its charter like that of Fannie makes clear that its sole purpose, like Fannie's, is to promote federal home financing policy. Federal Home Loan Mortgage Corporation Act, Pub. L. No. 91-351, 84 Stat. 450, 451 (1970) (codified, as amended, at 12 U.S.C. §§ 1451 *et seq*).

There is one loose end to tie up: a question of jurisdiction over Brian Hamer, the Director of the Illinois Department of Revenue. What for the sake of simplicity we've been treating as two suits, an Illinois suit and a Wisconsin suit, is actually three suits: a suit by Illinois counties, a suit by Milwaukee County, and a suit by Fannie, Freddie, and their conservator, the Federal Housing Finance Agency. Although Fannie, Freddie, and the agency were the defendants in the Illinois county suit and so were free to make their claims as counterclaims, they wanted relief against all the county recorders who had sent Fannie and Freddie demand letters. They also wanted relief against Hamer because, as we know, the State of Illinois and not just its counties wants to impose the real estate transfer tax on Fannie and Freddie. The appellees want to scotch that prospect by obtaining declaratory relief against the Illinois taxing authority. (They are suing Hamer in his official capacity, which means they're suing the state's Department of Revenue—the state's tax collector.) Of course even without such a judgment, a suit by the Department against Fannie and Freddie would be blocked by stare decisis. But they and their conservator want the even greater protection that a judgment against the Department would provide by virtue of the doctrine of res judicata.

Hamer makes wild claims for immunity on grounds of sovereign immunity, comity, and federalism, which we'll

ignore. His principal claim is that he (by which he means the state) is immune from the suit against him by virtue of the Tax Injunction Act, 28 U.S.C. § 1341. The Act forbids a federal district court to enjoin a state tax levy, provided there is an adequate state court remedy—as there is. If the state sued Fannie and Freddie in an Illinois state court to collect the real estate transfer, they could plead by way of defense their federal immunity from such taxation. Alternatively they could file the same claim they've made against Hamer in their present, federal suit in a suit in an Illinois state court. *Landfill, Inc. v. Pollution Control Board*, 387 N.E.2d 258, 261 (Ill. 1978).

Fannie does not contest the applicability to it of the Tax Injunction Act; Freddie does contest it, on the basis of a statutory provision, having no counterpart in the Fannie Mae statute, that provides that "notwithstanding … any other provision of law, … the district courts of the United States shall have original jurisdiction of all [civil] actions" to which Freddie is a party. 12 U.S.C. § 1452(f). The district court concluded on the basis of this provision that the Tax Injunction Act did not bar Freddie's suing Hamer in federal court. The United States argues that this was a mistake. It may well have been. Cf. *Arkansas v. Farm Credit Services of Central Arkansas*, 520 U.S. 821, 830–32 (1997). But we needn't decide, given that the Federal Housing Finance Agency is also a plaintiff in the suit against Hamer. The Tax Injunction Act "does not constrain the power of federal courts if the United States sues to protect itself or its instrumentalities from state taxation." *Id. at* 823–24. A suit by a federal agency to enforce federal interests is a suit by the United States. *NLRB v. Nash-Finch Co.*, 404 U.S. 138, 144–47 (1971); *Bank of New England Old Colony, N.A. v. Clark*, 986 F.2d 600, 602–03

(1st Cir. 1993); cf. *Arkansas v. Farm Credit Services of Central Arkansas*, *supra*, 520 U.S. at 831.

The appellants ask us to pierce the veil, as it were, in recognition of the fact that if the tax is paid, it will be paid from assets or income of Fannie or Freddie. But as long as their conservator is the United States, and the assets and income in question are those of entities charged with a federal duty (that of promoting the federal policy of encouraging home ownership), the conservator's suit against a state's tax collector is a suit by the United States, and so the Tax Injunction Act falls away. For consider why a *federal agency* is the conservator of private companies: it is because those private companies have a public duty, which the federal government's housing finance agency seeks to protect by marshaling the companies' assets. And so the Federal Housing Finance Agency is entitled, as the district court ruled, to the declaratory relief it seeks against Hamer.

In sum, except for the ruling that Freddie was also entitled to sue Hamer (an issue we leave open), the judgments appealed from are

AFFIRMED.