# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――――

Argued May 12, 2017          Decided June 27, 2017

No. 16-5070

CAROLINE HERRON,
APPELLANT

v.

FANNIE MAE, ET AL.,
APPELLEES

―――――

Consolidated with 16-5091

―――――

Appeals from the United States District Court
for the District of Columbia
(No. 1:10-cv-00943)

―――――

*Lynne Bernabei* argued the cause for appellant. With her on the briefs was *Alan R. Kabat*.

*Michael A.F. Johnson* argued the cause for appellee Federal Housing Finance Agency. With him on the brief were *Howard N. Cayne* and *Dirk Phillips*.

*Ira T. Kasdan* argued the cause for appellees The Federal National Mortgage Association, et al. With him on the briefs were *Bezalel A. Stern* and *Elizabeth C. Johnson*. *Damien G. Stewart* entered an appearance.

Before: BROWN and KAVANAUGH, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: Caroline Herron worked as an at-will contractor for the Federal National Mortgage Association, commonly known as Fannie Mae, on mortgage modification programs created by the Department of the Treasury ("Treasury") in response to the financial crisis in 2007 and 2008. According to Herron, Fannie Mae blocked her attempt to become an embedded contractor at Treasury and then terminated her contract work with Fannie Mae in retaliation for her purported disclosures of gross waste and mismanagement by Fannie Mae in administering the programs. Herron sued Fannie Mae and three Fannie Mae officers, asserting claims under District of Columbia law and, in the alternative, under *Bivens*. The district court dismissed the *Bivens* claim in a published opinion, holding that Fannie Mae is not a government actor, and, in a subsequent unpublished opinion, granted summary judgment against Herron on her remaining claims. For the reasons stated below, we affirm.

**I.**

Because of the numerous acronyms and terms of art employed in this opinion, we provide a brief glossary.

| | |
|---|---|
| EESA | Emergency Economic Stabilization Act of 2008 |
| FAA | Financial Agency Agreement |
| Fannie Mae | Federal National Mortgage Association |
| Freddie Mac | Federal Home Loan Mortgage Corporation |
| FHFA | Federal Housing Finance Agency |
| HAMP | Home Affordable Modification Program |
| HERA | Housing and Economic Recovery Act of 2008 |
| MHAP | Making Home Affordable Program |

## II.

Because the district court's opinions offer a detailed description, *see Herron v. Fannie Mae*, No. 1:10-cv-943, 2016 WL 1177918, at \*1–12 (D.D.C. Mar. 8, 2016) ("*Summary Judgment Opinion*"); *Herron v. Fannie Mae*, 857 F. Supp. 2d 87, 88–91 (D.D.C. 2012) ("Bivens *Opinion*"), we provide only a brief summary of the facts and allegations in this case.

## A.

Although it originated as a government-owned entity, Fannie Mae became a privately owned, government-sponsored corporation in 1968. *Perry Capital LLC v. Mnuchin*, 848 F.3d 1072, 1080 (D.C. Cir. 2017). Fannie Mae and its brother corporation, the Federal Home Loan Mortgage Corporation, also known as Freddie Mac, "buy residential mortgages from banks, repackage them for sale as mortgage-backed securities, and guarantee these securities by promising to make investors whole if borrowers default." *Judicial Watch, Inc. v. Fed. Housing Fin. Agency*, 646 F.3d 924, 925 (D.C. Cir. 2011). Fannie Mae and Freddie Mac play a central role in the national mortgage market by providing lenders with capital to make more loans. *Perry Capital*, 848 F.3d at 1080; *Judicial Watch*, 646 F.3d at 926.

During the 2000s, Fannie Mae and Freddie Mac "bought risky mortgages and got caught up in the housing bubble." *DeKalb Cty. v. Fed. Housing Fin. Agency*, 741 F.3d 795, 798 (7th Cir. 2013). The decline in housing prices in the mid-2000s "substantially eroded the value of Fannie [Mae]- and Freddie [Mac]-held mortgages." *Judicial Watch*, 646 F.3d at 926. The ensuing financial crisis in 2007 and 2008 pushed both firms "to the brink of collapse." *Perry Capital*, 848 F.3d at 1079. To prevent these government-sponsored enterprises from defaulting, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654. *Perry Capital*, 848 F.3d at 1079, 1080–81.

HERA established the Intervenor Federal Housing Finance Agency ("FHFA"), an independent federal agency charged with supervising and regulating Fannie Mae. *See* 12 U.S.C. § 4511; *Perry Capital*, 848 F.3d at 1080–81. Among other things, HERA authorized the FHFA to place Fannie Mae into conservatorship. *See* 12 U.S.C. § 4617(a). It exercised that authority on September 6, 2008. In conjunction with the appointment of the FHFA as conservator, Treasury committed to provide funding to Fannie Mae to keep it from defaulting. *See Perry Capital*, 848 F.3d at 1079, 1082.

**B.**

The financial crisis also spurred Congress to enact the Emergency Economic Stabilization Act of 2008 ("EESA"), Pub. L. No. 110-343, 122 Stat. 3765. The EESA provides the Secretary of the Treasury with the "authority and facilities . . . to restore liquidity and stability to the financial system of the United States," 12 U.S.C. § 5201(1), and directs the Secretary to act in a manner that, among other things, "preserves homeownership," *id.* § 5201(2)(B). To that end, the EESA authorized the Secretary to "implement a plan that seeks to

maximize assistance for homeowners" and to encourage loan servicers to minimize foreclosures. *Id.* § 5219(a)(1). Pursuant to this authority, the Secretary established the Home Affordable Modification Program ("HAMP"), which is designed to prevent foreclosures by encouraging loan servicers to modify mortgage terms for eligible homeowners.

A brief summary of HAMP is necessary to understand the factual allegations underlying this case. *See generally Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556–57 (7th Cir. 2012) (providing a detailed explanation of HAMP). HAMP—the largest mortgage modification program within Treasury's broader Making Home Affordable Program ("MHAP")—provides struggling homeowners with an opportunity to modify the terms of their mortgages, and can include changes such as reduced interest rates and term extensions. A HAMP modification consists of two steps. First, a servicer offers an eligible homeowner a "trial modification," which allows the homeowner to make modified mortgage payments for a specified term to determine whether those payments are sustainable. Then, if the homeowner successfully completes the trial modification, the servicer can convert the homeowner to a permanent mortgage modification. To encourage participation, Treasury offered financial incentives to servicers who agreed to these modifications, and, prior to June 1, 2010, Treasury permitted servicers to approve homeowners for trial modifications without written verification of income, meaning that servicers placed eligible homeowners in "stated" or "verbal" trial modifications, rather than compelling "verified" trial modifications.

On February 18, 2009, Treasury and Fannie Mae entered into a Financial Agency Agreement ("FAA"), under which Fannie Mae was to administer MHAP as a fiduciary to Treasury. *See* 12 U.S.C. § 5211(c)(3) (authorizing Treasury to

designate certain institutions as "financial agents of the Federal Government"). Fannie Mae was eligible to receive incentive payments from Treasury based on a number of metrics set forth in the FAA, including the number of modifications. And, at least in fiscal year 2009, Fannie Mae used the number of modifications, regardless of whether they converted to permanent modifications, as a metric in determining executive bonuses.

## C.

In June 2009, after the FHFA placed Fannie Mae into conservatorship, ICon Professional Services ("ICon"), a third-party contracting company, hired Herron to provide consulting services to Fannie Mae on MHAP and, more specifically, HAMP. Appellees Eric Schuppenhauer, a senior vice president at Fannie Mae, and Alanna Brown, Fannie Mae's Director of Government Programs and New Initiatives, were her direct supervisors. In addition to working with Fannie Mae officials and servicers, Herron worked directly with Treasury managers overseeing Fannie Mae's administration of MHAP.

Almost immediately after she began work at Fannie Mae, Herron raised a number of criticisms about Fannie Mae's administration of HAMP. *Summary Judgment Opinion*, 2016 WL 1177918, at *3. Herron does not press her argument concerning the excessive burdens Fannie Mae allegedly imposed on servicers on appeal. *See id.* at *3, *23–25. And she forfeited her argument concerning the extension of the HAMP enrollment deadline, *see id.* at *4–7, *28–30, by failing to adequately raise it in her opening brief. *See City of Waukesha v. EPA*, 320 F.3d 228, 250 n.22 (D.C. Cir. 2003). Therefore, the only criticism relevant to this appeal concerns the problems associated with the use of stated trial

modifications, including the low rate of conversion to permanent modifications. *See Summary Judgment Opinion*, 2016 WL 1177918, at *3–4, *25–27.

The record establishes that the problems with stated trial modifications were highly debated and controversial topics at both Fannie Mae and Treasury. *See id.* at *25–27. Herron contends, however, that she was the only one who disclosed the extent of the problems. According to Herron, Fannie Mae pushed stated trial modifications, not to assist homeowners, but to obtain incentive payments from Treasury and justify higher executive bonuses. Herron alleges that Fannie Mae knew that many homeowners enrolled in trial modifications would never be eligible to convert to permanent modifications, and therefore Fannie Mae wasted public funds and mismanaged HAMP by pushing these modifications.

Around the same time that she voiced these concerns, Herron began planning a move to Treasury. *See id.* at *7–11. On December 15, 2009, she proposed that she be hired by Fannie Mae as a dedicated "on site" or "embedded" contractor at Treasury. Fannie Mae officials, including Schuppenhauer, initially supported the idea but soon began expressing concerns. *See id.* at *7–8. More specifically, Schuppenhauer and Appellee Nancy Jardini, Fannie Mae's acting Chief Compliance Officer, raised potential conflicts of interest and ethics issues relating to the move. *Id.* at *8–9. The parties dispute the facts regarding these issues—Herron argues that Fannie Mae created "a spurious conflict of interest issue" to block her move, while Fannie Mae asserts that the move would create serious conflicts of interest that needed to be addressed. It appears undisputed, however, that Fannie Mae ultimately decided not to go through with the move. Schuppenhauer also admitted that Herron's criticisms of Fannie Mae's administration of HAMP may have affected his views. On

January 13, 2010, Herron told Schuppenhauer she was "ready to escalate" the question of her move to Fannie Mae's Executive Vice President Terry Edwards and Chief Executive Officer Mike Williams. After Schuppenhauer discussed the issue with Williams and Edwards, he terminated Herron's contract work with Fannie Mae on January 15.

After her HAMP work was terminated, Herron pursued other business opportunities in the industry. Two Fannie Mae managers, Rich McGhee and Patricia Fulcher, discussed the possibility of Herron working on non-HAMP projects, but one of Fannie Mae's compliance attorneys told McGhee and Fulcher to stop recruiting Herron. *See id.* at *11. Herron also discussed potential employment opportunities with Timothy Rood, the president of the Collingwood Group, a financial services consulting group. After speaking with his contacts at Fannie Mae, however, Rood informed Herron that she appeared to be "radioactive" and he did not think she would be an asset to the company.

On June 8, 2010, Herron sued Fannie Mae, Schuppenhauer, Brown, and Jardini, alleging that they blocked her move to Treasury and terminated her contract work in retaliation for her disclosures of Fannie Mae's "gross waste of public funds" and "gross mismanagement" in administering HAMP. Operating under the presumption that Fannie Mae is a private entity, Herron asserted claims under District of Columbia law for wrongful termination in violation of public policy, civil conspiracy, and tortious interference with prospective contractual relations. Alternatively, if Fannie Mae is a government actor, Herron alleged a *Bivens* claim for retaliation in response to the exercise of her First Amendment rights. *See generally Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

**D.**

Fannie Mae and the individual defendants first moved to dismiss Herron's alternative *Bivens* claim, asserting that Fannie Mae is a private entity and thus not subject to a *Bivens* action. The FHFA, in its capacity as conservator, intervened and moved to dismiss on the same ground. On April 30, 2012, the district court granted the motion. Bivens *Opinion*, 857 F. Supp. 2d at 88. Applying the framework set forth in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), the court concluded that Fannie Mae is "a private entity and the appointment of [the] FHFA as conservator . . . did not transform Fannie Mae into a public agency," because the conservatorship "did not establish *permanent* government authority to control Fannie Mae." *See* Bivens *Opinion*, 857 F. Supp. 2d at 88, 95–96.

After the parties engaged in extensive discovery, Fannie Mae and the individual defendants moved for summary judgment on Herron's remaining wrongful termination, tortious interference, and conspiracy claims. On March 8, 2016, the district court granted the motion. *Summary Judgment Opinion*, 2016 WL 1177918, at *1. The court recognized that Herron's status as an at-will contractor posed a fundamental problem for her tortious interference claim, *see id.* at *13–15, and her wrongful termination claim, *see id.* at *16. First, the court held that Herron's tortious interference claim failed as a matter of law because she had not identified a "commercially reasonable business expectancy" on which to base the claim. *See id.* at *12–16. Second, the court held that the EESA provided a sufficient "mandate of public policy" to support Herron's wrongful termination in violation of public policy claim. *See id.* at *16, *19–20. It nevertheless entered summary judgment against her on that claim after concluding that "there is not a close fit between [her] criticism of the use of stated

trials and her claimed public policy of disclosing Fannie Mae's gross mismanagement or waste of funds." *See id.* at \*20–23, \*25–27. Finally, the court explained that without "a cognizable underlying tort," Herron's conspiracy claim also failed. *See id.* at \*30.

Herron appealed, challenging the district court's order granting the motion to dismiss her *Bivens* claim and its order granting the motion for summary judgment against her on the common law claims. She also appeals two orders denying discovery. Herron's additional argument regarding unsealing the summary judgment briefing does not warrant separate discussion in this opinion.

Fannie Mae and the individual defendants cross-appealed, arguing that the district court's grant of summary judgment could be affirmed on the alternative ground that the EESA did not set forth a sufficient public policy on which to base a wrongful termination claim.

We have jurisdiction pursuant to 28 U.S.C. § 1291.

**III.**

We review *de novo* the district court's dismissal of Herron's alternative *Bivens* claim. *Emory v. United Air Lines, Inc.*, 720 F.3d 915, 921 (D.C. Cir. 2013).

Herron alleges that, if Fannie Mae is a government actor, Fannie Mae and the individual defendants, acting as officers of the United States government, all are liable for retaliating against her for the exercise of her First Amendment rights. Because Herron's *Bivens* claim is based on her contention that Fannie Mae "is not a private entity but Government itself," we need not "traverse th[e] difficult terrain" of the state action

doctrine. *Lebron*, 513 U.S. at 378; *see also Sprauve v. W. Indian Co.*, 799 F.3d 226, 229–30 (3d Cir. 2015); *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 83 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Instead, we apply the framework the Supreme Court established in *Lebron* for determining whether a "Government-created and -controlled corporation[]" is a government actor for constitutional purposes. 513 U.S. at 397.

In *Lebron*, the Court considered whether the National Railroad Passenger Corporation, commonly known as Amtrak, was part of the government for First Amendment purposes. *See id.* at 376, 394. Considering the "public and judicial understanding of the nature of Government-created and -controlled corporations over the years," *see id.* at 394–97, the Court noted that arrangements providing for temporary government control over a government-created corporation do not make that corporation a government actor, *see id.* at 398–99. The Court then concluded that a corporation is "part of the Government" for constitutional purposes when: "[(1)] the Government creates [the] corporation by special law, [(2)] for the furtherance of governmental objectives, and [(3)] retains for itself permanent authority to appoint a majority of the directors of that corporation . . . ." *Id.* at 400. Applying these criteria, the Court held that Amtrak was a government actor because "it is established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees." *See id.* at 397–98. As our sister circuits recognize, *Lebron* sets forth a three-part standard to determine whether a government-created corporation is part of the government for constitutional purposes. *See, e.g.*, *Hack*, 237 F.3d at 83–84.

This case satisfies the first two *Lebron* criteria. Congress created Fannie Mae to accomplish a number of governmental objectives for the national housing market. *See* 12 U.S.C. §§ 1716, 1716b, 4501; *Perry Capital*, 848 F.3d at 1080. Although Congress converted Fannie Mae to a private corporation in 1968, "its charter, and therefore its function . . ., were unchanged." *DeKalb Cty.*, 741 F.3d at 797. Neither Fannie Mae nor the FHFA challenge that Congress's creation of Fannie Mae furthered "governmental objectives." *See Am. Bankers Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 75 F.3d 1401, 1406–07 (9th Cir. 1996) (holding that Freddie Mac satisfied the first two *Lebron* criteria). The real dispute in this case centers on the final *Lebron* criterion: permanent government control.

Herron urges that permanent government control is not required under the *Lebron* framework. But "[w]e think *Lebron* means what it says." *Hack*, 237 F.3d at 84. To find that a government-created corporation is a government actor for constitutional purposes, *Lebron* clearly requires permanent government control. *See* 513 U.S. at 398–99. Otherwise put, permanency is "a necessary condition precedent" to consider a government-created corporation part of the government. *Sprauve*, 799 F.3d at 233 n.8 (citations omitted). We do not read *Department of Transportation v. Association of American Railroads*, 135 S. Ct. 1225 (2015), as dispensing with the permanency requirement. Consistent with *Lebron*, the Court in *Association of American Railroads* concluded that "the practical reality of federal control and supervision," not a statutory disclaimer, controls when determining an entity's status. *See id.* at 1231–33; *see also Lebron*, 513 U.S. at 392–93, 399. Because the government's permanent control over Amtrak was already established in *Lebron*, the Court had no occasion to revisit that question in *Association of American Railroads*. Moreover, we generally presume that the Court

does not overturn or limit its prior holdings through silence or implication. *See, e.g.*, *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). Accordingly, the *Lebron* framework requires permanency. *See, e.g.*, *Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 578–79 (4th Cir. 2017) (applying permanency requirement after *Association of American Railroads*).

We therefore turn to the question of whether the federal government exercises permanent control over Fannie Mae. Fannie Mae's organic statute, *see* 12 U.S.C. §§ 1716b, 1718(a), 1723(b), does not place it "under the direction and control of federal governmental appointees," *cf. Lebron*, 513 U.S. at 385–86, 397–98. Herron, therefore, does not dispute that Fannie Mae was a private entity before the conservatorship. *See, e.g.*, *Northrip v. Fed. Nat'l Mortg. Ass'n*, 527 F.2d 23, 30–32 (6th Cir. 1975); *see also Am. Bankers*, 75 F.3d at 1407–09 (applying the *Lebron* framework and concluding that pre-conservatorship Freddie Mac was not a government actor because the government did not "control the operation of Freddie Mac through its appointees" (quoting *Lebron*, 513 U.S. at 399) (alterations omitted)). Rather, she argues that the FHFA's conservatorship converted Fannie Mae into a government actor because it gave the government *de facto* permanent control over Fannie Mae. As noted, HERA authorized the FHFA "to undertake extraordinary economic measures" with regard to Fannie Mae, including placing it into conservatorship. *Perry Capital*, 848 F.3d 1080–81. Herron asserts that the conservatorship transformed Fannie Mae into a government actor because the federal government now exercises "pervasive and far-reaching" control over Fannie Mae, including the authority to determine its future. This is not the first time a plaintiff has advanced this argument, *see, e.g.*, *Rubin v. Fannie Mae*, 587 F. App'x 273, 275 (6th Cir. 2014); *Wright v. Fed.*

*Nat'l Mortg. Ass'n*, No. 1:13-cv-4294, 2014 WL 12042555, at *2–3 (N.D. Ga. Sept. 22, 2014), and it is not without some appeal. Nevertheless, Herron's argument misses the mark because the conservatorship does not amount to *permanent* government control.

The FHFA became conservator "for the purpose of reorganizing, rehabilitating, or winding up the affairs" of Fannie Mae. 12 U.S.C. § 4617(a)(2). Although there is no specific termination date, the purpose of the conservatorship is to restore Fannie Mae to a stable condition. *See, e.g.*, *id.* § 4617(b)(2)(D) (giving the FHFA authority as conservator to take actions "necessary to put [Fannie Mae] in a sound and solvent condition" and "appropriate to carry on [its] business . . . and preserve and conserve [its] assets and property"). "This is an inherently temporary purpose." *Rubin*, 587 F. App'x at 275. While the conservatorship authorized the government to exercise substantial control over Fannie Mae, "that control is temporary, 'as a private corporation whose stock comes into federal ownership might be.'" *See Meridian Invs.*, 855 F.3d at 579 (quoting *Lebron*, 513 U.S. at 398). Thus, the government's indefinite but temporary control does not transform Fannie Mae into a government actor. *See Lebron*, 513 U.S. at 399 (citing *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 152 (1974)).

Further, as conservator, the FHFA succeeded to "all rights, titles, powers, and privileges" of Fannie Mae. 12 U.S.C. § 4617(b)(2)(A)(i). This language evinces Congress's intention to have the FHFA step into Fannie Mae's private shoes. *Perry Capital*, 848 F.3d at 1103 & n.22. When it stepped into these shoes, the FHFA "shed[] its government character and . . . [became] a private party." *See Meridian Invs.*, 855 F.3d at 579. But while the FHFA's status changed, the status of Fannie Mae, as the "shoes" into which the FHFA

stepped, did not. *See United States ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259, 1261 (9th Cir. 2016) (explaining that the FHFA as conservator stepped into Fannie Mae's shoes, and "not the other way around").

In conclusion, the conservatorship over Fannie Mae did not create the type of permanent government control that is required under *Lebron*, and we therefore affirm the district court's dismissal of Herron's *Bivens* claim.

## IV.

Herron asserts the following claims under District of Columbia law against Fannie Mae in its capacity as a private entity: (1) wrongful termination in violation of public policy; (2) tortious interference with prospective contractual relations; and (3) civil conspiracy. We review *de novo* the district court's grant of summary judgment against Herron, *Robinson v. Pezzat*, 818 F.3d 1, 7 (D.C. Cir. 2016), and for the reasons stated below, we affirm.

## A.

The district court concluded that the EESA provided a sufficient public policy to support Herron's wrongful termination in violation of public policy claim, but it granted summary judgment against her because she failed to satisfy the "close fit" analysis. *See Summary Judgment Opinion*, 2016 WL 1177918, at *16, *19–23, *25–27. We affirm the district court's ultimate determination on the alternative ground that no public policy exception exists under the EESA.

The District of Columbia has long recognized that an at-will employee may be discharged "at any time and for any reason, or for no reason at all." *Liberatore v. Melville Corp.*,

168 F.3d 1326, 1329 (D.C. Cir. 1999) (quoting *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C. 1991)). But the District of Columbia Court of Appeals has recognized a "very narrow" public policy exception to the at-will employment doctrine. *Id.* (quoting *Adams*, 597 A.2d at 34). Although the exception initially applied only to cases in which an employee was discharged for refusal to violate the law, courts may recognize additional public policy exceptions on a case-by-case basis. *See Fingerhut v. Children's Nat'l Med. Ctr.*, 738 A.2d 799, 803–04 (D.C. 1999).

An exception warrants recognition if it is "firmly anchored either in the Constitution or in a statute or regulation which clearly reflects the particular 'public policy' being relied upon" and there is "a close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination." *Carl v. Children's Hosp.*, 702 A.2d 159, 162, 164 (D.C. 1997) (Terry, J., concurring);[1] *see also Liberatore*, 168 F.3d at 1331; *Fingerhut*, 738 A.2d at 803 n.7. "By tying new causes of action to statutory and constitutional provisions," courts are prevented from "defining nebulous concepts of public policy" and creating exceptions based on conduct that "simply tends to be injurious to the public or against the public good." *Rosella v. Long Rap, Inc.*, 121 A.3d 775, 778 (D.C. 2015) (citations and internal quotation marks omitted). Without this statutory anchor, the at-will doctrine would be reduced to "a virtual nullity." *Carl*, 702 A.2d at 163 (Terry, J., concurring).

Herron seeks to have this Court create a public policy exception to the at-will doctrine based on the EESA. That statute, Herron argues, reflects specific public policy interests

---

[1] Judge Terry's concurrence in *Carl* "constitutes the effective holding of the en banc court." *Rosella v. Long Rap, Inc.*, 121 A.3d 775, 778 n.3 (D.C. 2015); *see also Liberatore*, 168 F.3d at 1331.

in preventing foreclosures and protecting taxpayers' interests, which are directly relevant to Herron's purported disclosures of Fannie Mae's maladministration of MHAP. The district court agreed, holding that Herron's "claimed public policy of disclosing or protecting against the gross mismanagement and the gross waste of public funds is 'clearly reflected' and 'firmly anchored'" in the EESA. *Summary Judgment Opinion*, 2016 WL 1177918, at \*19–20. In this, the district court erred.

"[A]ny judicially recognized public policy exception to the at-will doctrine" must be "'carefully tethered' to rights officially recognized in statutes or regulations . . . ." *Carl*, 702 A.2d at 164 (Terry, J., concurring). For this reason, one "common denominator" can be found in all of the cases applying the public policy exception: "the existence of specific laws or regulations that clearly reflect a policy prohibiting the activity about which the employee complained . . . ." *Leyden v. Am. Accreditation Healthcare Comm'n*, 83 F. Supp. 3d 241, 249 (D.D.C. 2015) (collecting cases); *see also Freas v. Archer Servs., Inc.*, 716 A.2d 998, 999–1003 (D.C. 1998) (noting that plaintiff alleged facts demonstrating that he was discharged "in violation of a mandate explicitly set forth in [D.C.] law"). That common denominator is missing in this case.

The EESA provisions the district court relied upon simply identify the general purpose of the statute and the goals the Secretary must consider in exercising his statutory authority. *See* 12 U.S.C. §§ 5201, 5213. Sections 5201 and 5213 neither "set out a standard of conduct" for Fannie Mae nor "embody a specific public policy prohibiting [an employer] from engaging in the conduct [the employee] alleges." *Leyden*, 83 F. Supp. 3d at 249. These sections do not offer the sort of "declaration of policy . . . needed to support a public policy exception to the at-will doctrine," *Carl*, 702 A.2d at 165 n.9 (Terry, J., concurring), and courts are prohibited from creating new

exceptions by "broaden[ing] the policies expressed" in a statute or "fill[ing] a perceived gap in the statute," *id.* at 162–63 (Terry, J., concurring) (citation, internal quotation marks, and alteration omitted). Relying on these provisions to create a new public policy exception would contravene the District of Columbia Court of Appeals' admonition against finding generalized exceptions. *See Rosella*, 121 A.3d at 778. The district court therefore erred in concluding that Herron had identified a clear source of public policy upon which to base an exception to the at-will doctrine.

But, because we reject Herron's request to recognize an exception that is not clearly reflected or firmly anchored in a statute or regulation, we affirm the district court's granting of summary judgment against Herron on her wrongful termination claim.

## B.

To support her tortious interference with prospective contractual relations claim, Herron relies on three expectancies: (1) working as a Fannie Mae contractor embedded at Treasury; (2) working as a Fannie Mae contractor on non-HAMP projects; and (3) working for the Collingwood Group. Under District of Columbia law, a tortious interference with prospective contractual relations claim requires a valid business expectancy, the defendant's knowledge of the expectancy, intentional interference causing a termination of the expectancy, and damages. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1134 (D.C. Cir. 2015); *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 345–46 (D.C. 2015). This theory of tortious interference protects "business expectancies, not grounded on present contractual relationships but which are commercially reasonable to anticipate, . . . from

unjustified interference." *Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978). Because Herron has not identified a valid business expectancy, her claim fails.

Herron cannot maintain a claim for tortious interference based on either of her expectancies of working as an at-will Fannie Mae contractor. The District of Columbia Court of Appeals has been reluctant to recognize a claim for tortious interference with prospective contractual relations based on a prospective at-will relationship. *See, e.g.*, *McManus v. MCI Commc'ns Corp.*, 748 A.2d 949, 957–58 (D.C. 2000). In an attempt to overcome the at-will hurdle, Herron alleges that she had a reasonable expectation of continuing employment because Fannie Mae "routinely and automatically renewed" contracts such as hers. Even assuming these contracts were routinely renewed, that fact is insufficient to rebut the at-will presumption. *See id.* at 957 (holding that at-will employee could not base her tortious interference claim on "a long-term employment relationship and an expectancy of continuing employment relations with [the defendant]"); *Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Washington, D.C. v. Beards*, 680 A.2d 419, 433 (D.C. 1996) (concluding that plaintiffs failed to state a tortious interference claim based on an allegation of "a tacit agreement" of continued employment); *see also Summary Judgment Opinion*, 2016 WL 1177918, at *14 (rejecting Herron's argument that she was not an at-will contractor).

Herron's claim fails for "an additional simple reason." *Summary Judgment Opinion*, 2016 WL 1177918, at *14. In this case, Herron argues that Fannie Mae interfered with her prospective contractual relations *with Fannie Mae*. But, just as an employer cannot interfere with its own contract, Fannie Mae cannot interfere with its own business relationships. *See Little v. Dist. of Columbia Water & Sewer Auth.*, 91 A.3d 1020, 1030

n.12 (D.C. 2014); *Paul v. Howard Univ.*, 754 A.2d 297, 309–10 (D.C. 2000); *McManus*, 748 A.2d at 957–58; *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1255 (D.C. Cir. 2005) (noting that "the duty not to interfere with the plaintiff's economic relationship with a third party" underlies tortious interference claims); *Dow Chem. Corp. v. Weevil-Cide Co.*, 897 F.2d 481, 488–89 (10th Cir. 1990) (explaining that, for purposes of a tortious interference with prospective contractual relations claim, "one cannot 'interfere' with its own affairs").

We also conclude that Herron's proffered expectancy outside of Fannie Mae is too remote to support a tortious interference claim. The prospect of obtaining employment is a recognized expectancy protected from interference. *Carr*, 395 A.2d at 84. But any expectancy "'must be commercially reasonable to anticipate' before its loss may be actionable." *Banneker Ventures*, 798 F.3d at 1134 (quoting *Browning*, 292 F.3d at 242). As the District of Columbia Court of Appeals has recognized, some expectancies are "simply too remote" to support a tortious interference claim. *Carr*, 395 A.2d at 84. Herron argues that she "pursued a position" at the Collingwood Group by discussing potential opportunities with the company's president. To have an actionable claim, however, she must show "a probability of future contractual or economic relationship and not a mere possibility." *Havilah Real Prop. Servs.*, 108 A.3d at 351 (citation omitted); *cf. Banneker Ventures*, 798 F.3d at 1134–35 (holding that the plaintiff had demonstrated "far more than a 'hope'" of a future relationship). There is nothing in the record—such as a "prospective final agreement," *see Banneker Ventures*, 798 F.3d at 1135—to support an inference that it was commercially reasonable for Herron to anticipate employment with the Collingwood Group. Herron's claim that she pursued a position, standing alone, falls

short of establishing a valid business expectancy. *Cf. Browning*, 292 F.3d at 242–43.

Because Herron failed to demonstrate a genuine issue of material fact as to any valid business expectancy, we affirm the district court's grant of summary judgment.

## C.

Herron alleged in her complaint that Fannie Mae and the individual defendants conspired to wrongfully terminate her contract work. Citing *Myers v. Alutiiq International Solutions, LLC*, 811 F. Supp. 2d 261 (D.D.C. 2011), she argues on appeal that, instead of pursuing a conspiracy claim, she can proceed directly against the individual defendants on her wrongful termination claim. *See id.* at 268–70 (holding that D.C. case law suggests that a plaintiff may be able assert claims for wrongful termination against individual employees). It appears, therefore, that Herron has dropped her civil conspiracy claim. In any event, since Herron has failed to establish a cognizable underlying tort, her conspiracy claim fails. *See Browning*, 292 F.3d at 245. We therefore affirm the district court's grant of summary judgment.

## V.

Herron also challenges two discovery rulings, which we review only for abuse of discretion. *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584 (D.C. Cir. 2016); *Brune v. IRS*, 861 F.2d 1284, 1288 (D.C. Cir. 1988).

## A.

Herron asserts that the district court abused its discretion by denying discovery into the government's control of Fannie

Mae before dismissing her *Bivens* claim. A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a plaintiff's complaint; it does not require a court to "assess the truth of what is asserted or determine whether a plaintiff has any evidence to back up what is in the complaint." *Browning*, 292 F.3d at 242 (citations, internal quotation marks, and alteration omitted). For this reason, Herron was not entitled to discovery before the court ruled on the motion to dismiss. *See, e.g.*, *Mujica v. AirScan Inc.*, 771 F.3d 580, 593 & n.7 (9th Cir. 2014); *Kolley v. Adult Protective Servs.*, 725 F.3d 581, 587 (6th Cir. 2013). In addition, for purposes of the motion to dismiss, the district court assumed that the federal government would not allow Fannie Mae to emerge from the conservatorship as a private entity, which is precisely the information Herron sought in discovery. Because Herron failed to state a *Bivens* claim against Fannie Mae, the district court did not abuse its discretion by denying her discovery into Fannie Mae's status as "a *Lebron* state actor." *See Hack*, 237 F.3d at 84–85.

**B.**

Herron also argues that she was entitled to discovery into the facts underlying a report that details the results of an investigation into Herron's allegations undertaken by Fannie Mae. *See Summary Judgment Opinion*, 2016 WL 1177918, at *7 n.8 (discussing the report). During a telephone conference in or around April 2011, the district court denied Herron's discovery request but did not memorialize its order. We are constrained in our review because Herron failed to follow the proper procedure to allow this Court to adequately consider the district court's discovery ruling. When a district court makes a ruling off the record, Rule 10(c) of the Federal Rules of Appellate Procedure provides an appellant with a mechanism to reconstruct the record and bring that ruling before an appellate court. *See* FED. R. APP. P. 10(c). Herron, as the

appellant, bore the burden of invoking and complying with Rule 10(c) to properly challenge the district court's ruling denying discovery into the report. Because the district court's ruling was not memorialized and Herron failed to comply with the procedure set forth in Rule 10(c), "meaningful appellate review is virtually impossible." *Badami v. Flood*, 214 F.3d 994, 999 (8th Cir. 2000). Under these circumstances, "we have no option but to defer to the district court's ruling . . . ." *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1517 (10th Cir. 1990).

* * *

For the reasons stated above, the district court's orders are affirmed.

*So ordered.*